CITY OF RIVERSIDE ET AL. *v.* RIVERA ET AL.

No. 85–224.   Argued March 31, 1986—Decided June 27, 1986

BRENNAN, J., announced the judgment of the Court and delivered an opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in the judgment, *post*, p. 581. BURGER, C. J., filed a dissenting opinion, *post*, p. 587. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and WHITE and O'CONNOR, JJ., joined, *post*, p. 588.

*Jonathan Kotler* argued the cause and filed briefs for petitioners.

*Gerald P. Lopez* argued the cause and filed a brief for respondents.*

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Geller, William Kanter,* and *Michael Jay Singer;* for Americans for Effective Law Enforcement, Inc., et al. by *Jack E. Yelverton, David Crump, Daniel B. Hales, Fred E. Inbau, Wayne W. Schmidt,* and *James P. Manak;* for Concerned Women for American Education and Legal Defense Foundation by *Michael P. Farris* and *Jordan W. Lorence;* for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Thomas R. Bagby;* and for Congressman Thomas J. Bliley, Jr., et al. by *Daniel J. Popeo* and *George C. Smith.*

Briefs of *amici curiae* urging affirmance were filed for Lambda Legal Defense and Education Fund, Inc., et al. by *Abby R. Rubenfeld;* and for the NAACP Legal Defense and Educational Fund, Inc., by *Julius LeVonne Chambers* and *Charles Stephen Ralston.*

*Paul M. Smith* and *Joseph N. Onek* filed a brief for the Washington Council of Lawyers et al. as *amici curiae.*

JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join.

The issue presented in this case is whether an award of attorney's fees under 42 U. S. C. § 1988 is *per se* "unreasonable" within the meaning of the statute if it exceeds the amount of damages recovered by the plaintiff in the underlying civil rights action.

I

Respondents, eight Chicano individuals, attended a party on the evening of August 1, 1975, at the Riverside, California, home of respondents Santos and Jennie Rivera. A large number of unidentified police officers, acting without a warrant, broke up the party using tear gas and, as found by the District Court, "unnecessary physical force." Many of the guests, including four of the respondents, were arrested. The District Court later found that "[t]he party was not creating a disturbance in the community at the time of the break-in." App. 188. Criminal charges against the arrestees were ultimately dismissed for lack of probable cause.

On June 4, 1976, respondents sued the city of Riverside, its Chief of Police, and 30 individual police officers under 42 U. S. C. §§ 1981, 1983, 1985(3), and 1986 for allegedly violating their First, Fourth, and Fourteenth Amendment rights. The complaint, which also alleged numerous state-law claims, sought damages and declaratory and injunctive relief. On August 5, 1977, 23 of the individual police officers moved for summary judgment; the District Court granted summary judgment in favor of 17 of these officers. The case against the remaining defendants proceeded to trial in September 1980. The jury returned a total of 37 individual verdicts in favor of the respondents and against the city and five individual officers, finding 11 violations of § 1983, 4 instances of false arrest and imprisonment, and 22 instances of negligence. Respondents were awarded $33,350 in compensatory and pu-

nitive damages: $13,300 for their federal claims, and $20,050 for their state-law claims.[1]

Respondents also sought attorney's fees and costs under § 1988. They requested compensation for 1,946.75 hours expended by their two attorneys at a rate of $125 per hour, and for 84.5 hours expended by law clerks at a rate of $25 per hour, a total of $245,456.25. The District Court found both the hours and rates reasonable, and awarded respondents $245,456.25 in attorney's fees. The court rejected respondents' request for certain additional expenses, and for a multiplier sought by respondents to reflect the contingent nature of their success and the high quality of their attorneys' efforts.

Petitioners appealed only the attorney's fees award, which the Court of Appeals for the Ninth Circuit affirmed. *Rivera* v. *City of Riverside*, 679 F. 2d 795 (1982). Petitioners sought a writ of certiorari from this Court. We granted the writ, vacated the Court of Appeals' judgment, and remanded the case for reconsideration in light of *Hensley* v. *Eckerhart*, 461 U. S. 424 (1983). 461 U. S. 952 (1983). On remand, the District Court held two additional hearings, reviewed additional briefing, and reexamined the record as a whole. The court made extensive findings of fact and conclusions of law, and again concluded that respondents were entitled to an

---

[1] Counsel for respondents explained to the District Court that respondents had not pursued their request for injunctive relief because "the bottom line of what we would ask for is that the police officers obey the law. And that is virtually always denied by a court because a court properly, I think, says that for the future we will assume that all police officers will abide by the law, including the Constitution." App. 219. The District Court's response to this explanation is significant:

"[I]f you [respondents] had asked for [injunctive relief] against some of the officers I think I would have granted it. . . . I would agree with you that there is a problem about telling the officers that they have to obey the law. But if you want to know what the Court thought about some of the behavior, it was—it would have warranted an injunction." *Ibid.*

566

award of $245,456.25 in attorney's fees, based on the same total number of hours expended on the case and the same hourly rates.[2] The court again denied respondents' request for certain expenses and for a multiplier.

Petitioners again appealed the fee award. And again, the Court of Appeals affirmed, finding that "the district court correctly reconsidered the case in light of *Hensley* . . . ." 763 F. 2d 1580, 1582 (1985). The Court of Appeals rejected three arguments raised by petitioners. First, the court rejected petitioners' contention that respondents' counsel should not have been compensated for time spent litigating claims other than those upon which respondents ultimately prevailed. Emphasizing that the District Court had determined that respondents' attorneys had "spent no time on claims unrelated to the successful claims," *ibid.*, the Court of Appeals concluded that "[t]he record supports the district court's findings that all of the plaintiffs' claims involve a 'common core of facts' and that the claims involve related legal theories." *Ibid.* The court also observed that, consistent with *Hensley*, the District Court had "considered the degree of success [achieved by respondents' attorneys] and found a reasonable relationship between the extent of that success and the amount of the fee award." 763 F. 2d, at 1582. Second, the Court of Appeals rejected the argument that the fee award was excessive because it exceeded the amount of damages awarded by the jury. Examining the legislative history of § 1988, the court found no support for the proposition that an award of attorney's fees may not exceed the amount of damages recovered by a prevailing plaintiff. Finally, the

---

[2] The District Court determined that $125 per hour was the "rate typical of the prevailing market rate for similar services by lawyers of comparable skill, experience and reputation within the Central District at the time these services were performed," *id.*, at 190, and that "[t]he rate of $25 per hour, which counsel seeks as compensation for the time expended by two law clerks, was lower than the customary hourly rate for such services at the time those services were performed." *Ibid.*

court found that the District Court's "extensive findings of fact and conclusions of law" belied petitioners' claim that the District Court had not reviewed the record to determine whether the fee award was justified. The Court of Appeals concluded:

> "In short, the district court applied the necessary criteria to justify the attorney's fees awarded and explained the reasons for the award clearly and concisely. As required by *Hensley*, the district court adequately discussed the extent of the plaintiffs' success and its relationship to the amount of the attorney's fees awarded. The award is well within the discretion of the district court." *Id.*, at 1583 (citation omitted).

Petitioners again sought a writ of certiorari from this Court, alleging that the District Court's fee award was not "reasonable" within the meaning of § 1988, because it was disproportionate to the amount of damages recovered by respondents. We granted the writ, 474 U. S. 917 (1985), and now affirm the Court of Appeals.

## II

## A

In *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240 (1975), the Court reaffirmed the "American Rule" that, at least absent express statutory authorization to the contrary, each party to a lawsuit ordinarily shall bear its own attorney's fees. In response to *Alyeska*, Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988, which authorized the district courts to award reasonable attorney's fees to prevailing parties in specified civil rights litigation. While the statute itself does not explain what constitutes a reasonable fee, both the House and Senate Reports accompanying § 1988 expressly endorse the analysis set forth in *Johnson* v. *Georgia Highway Express, Inc.*, 488 F. 2d 714 (CA5 1974). See S. Rep. No. 94–1011, p. 6 (1976) (hereafter Senate Report); H. R.

Rep. No. 94–1558, p. 8 (1976) (hereafter House Report). *Johnson* identifies 12 factors to be considered in calculating a reasonable attorney's fee.[3]

*Hensley* v. *Eckerhart, supra,* announced certain guidelines for calculating a reasonable attorney's fee under § 1988. *Hensley* stated that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.,* at 433. This figure, commonly referred to as the "lodestar," is presumed to be the reasonable fee contemplated by § 1988. The opinion cautioned that "[t]he district court . . . should exclude from this initial fee calculation hours that were not 'reasonably expended'" on the litigation. *Id.,* at 434 (quoting Senate Report, at 6).

*Hensley* then discussed other considerations that might lead the district court to adjust the lodestar figure upward or downward, including the "important factor of the 'results obtained.'" 461 U. S., at 434. The opinion noted that where a prevailing plaintiff has succeeded on only some of his claims, an award of fees for time expended on unsuccessful claims may not be appropriate. In these situations, the Court held that the judge should consider whether or not the plaintiff's unsuccessful claims were related to the claims on which he succeeded, and whether the plaintiff achieved a level of success that makes it appropriate to award attorney's fees for hours reasonably expended on unsuccessful claims:

---

[3] These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F. 2d, at 717–719.

"In [some] cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*, at 435.

Accordingly, *Hensley* emphasized that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," and that "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Ibid.*

## B

Petitioners argue that the District Court failed properly to follow *Hensley* in calculating respondents' fee award. We disagree. The District Court carefully considered the results obtained by respondents pursuant to the instructions set forth in *Hensley*, and concluded that respondents were entitled to recover attorney's fees for all hours expended on the litigation. First, the court found that "[t]he amount of time expended by counsel in conducting this litigation was reasonable and reflected sound legal judgment under the circumstances." App. 190.[4] The court also determined that

---

[4] *Hensley* stated that a fee applicant should "exercise 'billing judgment' with respect to hours worked." 461 U. S., at 437. Petitioners maintain that respondents failed to exercise "billing judgment" in this case, since they sought compensation for all time spent litigating this case. We think this argument misreads the mandate of *Hensley*. *Hensley* requires a fee applicant to exercise "billing judgment" not because he should necessarily be compensated for less than the actual number of hours spent litigating a case, but because the hours he does seek compensation for must be *reasonable*. "Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or other-

counsel's excellent performances in this case entitled them to be compensated at prevailing market rates, even though they were relatively young when this litigation began. See *Johnson*, 488 F. 2d, at 718–719 ("If a young attorney demonstrates the skill and ability, he should not be penalized for only recently being admitted to the bar").

The District Court then concluded that it was inappropriate to adjust respondents' fee award downward to account for the fact that respondents had prevailed only on some of their claims, and against only some of the defendants. The court first determined that "it was never actually clear what officer did what until we had gotten through with the whole trial," App. 236, so that "[u]nder the circumstances of this case, it was reasonable for plaintiffs initially to name thirty-one individual defendants . . . as well as the City of Riverside as defendants in this action." *Id.*, at 188. The court remarked:

"I think every one of the claims that were made were related and if you look at the common core of facts that we had here that you had total success. . . . There was a problem about who was responsible for what and that problem was there all the way through to the time that we concluded the case. Some of the officers couldn't agree about who did what and it is not at all surprising that it would, in my opinion, have been wrong for you

wise unnecessary . . . ." *Id.*, at 434. In this case, the District Court found that the number of hours expended by respondents' counsel was *reasonable*. Thus, counsel did, in fact, exercise the "billing judgment" recommended in *Hensley*.

*Hensley* also stated that a fee applicant should "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Id.*, at 437. Petitioners submit that the time records submitted by respondents' attorneys made it difficult for the District Court to identify and separate distinct claims. The District Court, however, does not appear to have shared this view. In any event, while it is true that some of the disputed time records do not identify the precise claims worked on at the time, we find this lapse unimportant, in light of the District Court's finding that all of respondents' claims were interrelated.

not to join all those officers since you yourself did not know precisely who were the officers that were responsible." *Id.*, at 235–236.

The court then found that the lawsuit could not "be viewed as a series of discrete claims," *Hensley*, 461 U. S., at 435:

"All claims made by plaintiffs were based on a common core of facts. The claims on which plaintiffs did not prevail were closely related to the claims on which they did prevail. The time devoted to claims on which plaintiffs did not prevail cannot reasonably be separated from time devoted to claims on which plaintiffs did prevail." App. 189.

The District Court also considered the amount of damages recovered, and determined that the size of the damages award did not imply that respondents' success was limited:

"[T]he size of the jury award resulted from (a) the general reluctance of jurors to make large awards against police officers, and (b) the dignified restraint which the plaintiffs exercised in describing their injuries to the jury. For example, although some of the actions of the police would clearly have been insulting and humiliating to even the most insensitive person and were, in the opinion of the Court, intentionally so, plaintiffs did not attempt to play up this aspect of the case." *Id.*, at 188–189.[5]

The court paid particular attention to the fact that the case "presented complex and interrelated issues of fact and law,"

---

[5] At the second hearing on remand, the court also remarked:

"I have tried several civil rights violation cases in which police officers have figured and in the main they prevailed because juries do not bring in verdicts against police officers very readily nor against cities. The size of the verdicts against the individuals is not at all surprising because juries are very reluctant to bring in large verdicts against police officers who don't have the resources to answer those verdicts. The relief here I think was absolutely complete." App. 235.

*id.*, at 187, and that "[a] fee award in this civil rights action will . . . advance the public interest," *id.*, at 191:

"Counsel for plaintiffs . . . served the public interest by vindicating important constitutional rights. Defendants had engaged in lawless, unconstitutional conduct, and the litigation of plaintiffs' case was necessary to remedy defendants' misconduct. Indeed, the Court was shocked at some of the acts of the police officers in this case and was convinced from the testimony that these acts were motivated by a general hostility to the Chicano community in the area where the incident occured. The amount of time expended by plaintiffs' counsel in conducting this litigation was clearly reasonable and necessary to serve the public interest as well as the interests of plaintiffs in the vindication of their constitutional rights." *Id.*, at 190.

Finally, the District Court "focus[ed] on the significance of the overall relief obtained by [respondents] in relation to the hours reasonably expended on the litigation." *Hensley, supra*, at 435. The court concluded that respondents had "achieved a level of success in this case that makes the total number of hours expended by counsel a proper basis for making the fee award," App. 192:

"Counsel for plaintiffs achieved excellent results for their clients, and their accomplishment in this case was outstanding. The amount of time expended by counsel in conducting this litigation was reasonable and reflected sound legal judgment under the circumstances." *Id.*, at 190.

Based on our review of the record, we agree with the Court of Appeals that the District Court's findings were not clearly erroneous. We conclude that the District Court correctly applied the factors announced in *Hensley* in calculating respondents' fee award, and that the court did not abuse its

discretion in awarding attorney's fees for all time reasonably spent litigating the case.[6]

### III

Petitioners, joined by the United States as *amicus curiae*, maintain that *Hensley*'s lodestar approach is inappropriate in civil rights cases where a plaintiff recovers only monetary damages. In these cases, so the argument goes, use of the lodestar may result in fees that exceed the amount of damages recovered and that are therefore unreasonable. Likening such cases to private tort actions, petitioners and the United States submit that attorney's fees in such cases should be proportionate to the amount of damages a plaintiff recovers. Specifically, they suggest that fee awards in damages cases should be modeled upon the contingent-fee arrangements commonly used in personal injury litigation. In this case, assuming a 33% contingency rate, this would enti-

---

[6] In addition to the amount involved and the results obtained, the District Court also discussed several of the other factors identified in *Johnson*, including: the time and labor required; the novelty and difficulty of the questions presented; the skill requisite to perform the legal service properly; the customary fee; the experience, reputation, and ability of the attorneys; and the undesirability of the case.

With respect to the time and labor required to litigate the case, petitioners suggest that much of the time for which respondents' counsel received compensation was not "reasonable." See Brief for Petitioners 12–13. However, the District Court considered, and properly rejected, these arguments. For example, petitioners object to fees being awarded for the 59 hours respondents' counsel spent preparing jury instructions which, according to petitioners, "were subsequently mostly discarded by the trial court." *Id.*, at 12. The District Court, however, denied having discarded respondents' jury instructions. App. 215. Similarly, petitioners object to fees being awarded for 197 hours of conversation between respondents' two attorneys. The District Court however, noted: "I haven't got any doubt that it probably took 250 hours of conversation about the case between the two of them." *Ibid.* We believe that the District Court was in the best position to determine whether the time expended by respondents' counsel was reasonable.

tle respondents to recover approximately $11,000 in attorney's fees.

The amount of damages a plaintiff recovers is certainly relevant to the amount of attorney's fees to be awarded under § 1988. See *Johnson*, 488 F. 2d, at 718. It is, however, only one of many factors that a court should consider in calculating an award of attorney's fees. We reject the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers.

### A

As an initial matter, we reject the notion that a civil rights action for damages constitutes nothing more than a private tort suit benefiting only the individual plaintiffs whose rights were violated. Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms. See *Carey* v. *Piphus*, 435 U. S. 247, 266 (1978). And, Congress has determined that "the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in § 1988, over and above the value of a civil rights remedy to a particular plaintiff. . . ." *Hensley*, 461 U. S., at 444, n. 4 (BRENNAN, J., concurring in part and dissenting in part). Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards. In this case, for example, the District Court found that many of petitioners' unlawful acts were "motivated by a general hostility to the Chicano community," App. 190, and that this litigation therefore served the public interest:

"The institutional behavior involved here . . . had to be stopped and . . . nothing short of having a lawsuit like this would have stopped it. . . . [T]he improper motivation which appeared as a result of all of this seemed to

me to have pervaded a very broad segment of police officers in the department." *Id.*, at 237.[7]

In addition, the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future. See *McCann* v. *Coughlin*, 698 F. 2d 112, 129 (CA2 1983). This deterrent effect is particularly evident in the area of individual police misconduct, where injunctive relief generally is unavailable.

Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit "'does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance.'" House Report, at 2 (quoting *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400, 402 (1968)). "If the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers." 122 Cong. Rec. 33313 (1976) (remarks of Sen. Tunney).

Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief. Rather, Congress made clear that it "intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and *not be reduced because the rights involved may be nonpecuniary in nature.*" Senate Report, at 6 (emphasis added). "[C]ounsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, *'for all time reasonably expended on a matter.'*" *Ibid.* (quoting *Van Davis*

---

[7] The District Court also observed that even though respondents ultimately dropped their request for injunctive relief, petitioners' misconduct clearly "would have warranted an injunction." *Id.*, at 219; see n. 1, *supra.*

v. *County of Los Angeles,* 8 EPD ¶9444 (CD Cal. 1974) (emphasis added)). The Senate Report specifically approves of the fee awards made in cases such as *Stanford Daily* v. *Zurcher,* 64 F. R. D. 680 (ND Cal. 1974); *Van Davis* v. *County of Los Angeles, supra;* and *Swann* v. *Charlotte-Mecklenburg Board of Education,* 66 F. R. D. 483 (WDNC 1975). In each of these cases, counsel received substantial attorney's fees despite the fact the plaintiffs sought no monetary damages. Thus, Congress recognized that reasonable attorney's fees under § 1988 are not conditioned upon and need not be proportionate to an award of money damages. The lower courts have generally eschewed such a requirement.[8]

### B

A rule that limits attorney's fees in civil rights cases to a proportion of the damages awarded would seriously undermine Congress' purpose in enacting § 1988. Congress enacted § 1988 specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process. See House Report, at 3. These victims ordinarily cannot afford to purchase legal services at the rates set by the private market. See *id.,* at 1 ("Because a vast majority of the victims of civil rights violations cannot afford legal counsel, they are unable to present their cases to the courts"); Senate Report, at 2 ("In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer"); see

---

[8] See *DeFilippo* v. *Morizio,* 759 F. 2d 231, 235 (CA2 1985); *Ramos* v. *Lamm,* 713 F. 2d 546, 557 (CA10 1983); *McCann* v. *Coughlin,* 698 F. 2d 112, 128–129 (CA2 1983); *Jones* v. *MacMillan Bloedel Containers, Inc.,* 685 F. 2d 236, 238–239 (CA8 1982); *Basiardanes* v. *City of Galveston,* 682 F. 2d 1203, 1220 (CA5 1982); *Furtado* v. *Bishop,* 635 F. 2d 915, 917–918 (CA1 1980); *Coop* v. *City of South Bend,* 635 F. 2d 652, 655 (CA7 1980); *Perez* v. *University of Puerto Rico,* 600 F. 2d 1, 2 (CA1 1979); *Walston* v. *School Board,* 566 F. 2d 1201, 1204–1205 (CA4 1977).

also 122 Cong. Rec. 35127 (1976) (remarks of Rep. Holtzman) ("Plaintiffs who suffer discrimination and other infringements of their civil rights are usually not wealthy people"); *id.*, at 35128 (remarks of Rep. Seiberling) ("Most Americans . . . cannot afford to hire a lawyer if their constitutional rights are violated or if they are the victims of illegal discrimination"); *id.*, at 31832 (remarks of Sen. Hathaway) ("[R]ight now the vindication of important congressional policies in the vital area of civil rights is made to depend upon the financial resources of those least able to promote them"). Moreover, the contingent fee arrangements that make legal services available to many victims of personal injuries would often not encourage lawyers to accept civil rights cases, which frequently involve substantial expenditures of time and effort but produce only small monetary recoveries. As the House Report states:

> "[W]hile damages are theoretically available under the statutes covered by [§ 1988], it should be observed that, in some cases, immunity doctrines and special defenses, available only to public officials, preclude *or severely limit the damage remedy.* Consequently, awarding counsel fees to prevailing plaintiffs in such litigation is particularly important and necessary if Federal civil and consitutional rights are to be adequately protected." House Report, at 9. (emphasis added; footnote omitted).

See also 122 Cong. Rec., at 33314 (remarks of Sen. Kennedy) ("[C]ivil rights cases—unlike tort or antitrust cases—do not provide the prevailing plaintiff with a large recovery from which he can pay his lawyer"). Congress enacted § 1988 specifically to enable plaintiffs to enforce the civil rights laws even where the amount of damages at stake would not otherwise make it feasible for them to do so:

> "[F]ee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vin-

dicate the important Congressional policies which these laws contain.

"... If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court." Senate Report, at 2.

See also *Kerr* v. *Quinn*, 692 F. 2d 875, 877 (CA2 1982) ("The function of an award of attorney's fees is to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel").

A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts. This is totally inconsistent with Congress' purpose in enacting § 1988. Congress recognized that private-sector fee arrangements were inadequate to ensure sufficiently vigorous enforcement of civil rights. In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case.[9]

---

[9] Of course, we do not mean to suggest that private-sector comparisons are irrelevant to fee calculations under § 1988. We have suggested that in determining an appropriate hourly rate for a lawyer's services, "the rates charged in private representations may afford relevant comparisons." *Blum* v. *Stenson*, 465 U. S. 886, 896, n. 11 (1984). We have also indicated that "[c]ounsel for a prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U. S., at 434. However, while private-market considerations are not irrelevant, Congress clearly rejected the notion that attorney's fees under § 1988 should be based on private-sector fee arrangements.

This case illustrates why the enforcement of civil rights laws cannot be entrusted to private-sector fee arrangements. The District Court observed that "[g]iven the nature of this lawsuit and the type of defense presented, many attorneys in the community would have been reluctant to institute and to continue to prosecute this action." App. 189. The court concluded, moreover, that "[c]ounsel for plaintiffs achieved excellent results for their clients, and their accomplishment in this case was outstanding. The amount of time expended by counsel in conducting this litigation was reasonable and reflected sound legal judgment under the circumstances." *Id.*, at 190. Nevertheless, petitioners suggest that respondents' counsel should be compensated for only a small fraction of the actual time spent litigating the case. In light of the difficult nature of the issues presented by this lawsuit and the low pecuniary value of many of the rights respondents sought to vindicate, it is highly unlikely that the prospect of a fee equal to a fraction of the damages respondents might recover would have been sufficient to attract competent counsel.[10] Moreover, since counsel might not have found it economically feasible to expend the amount of time respondents' counsel found necessary to litigate the case properly, it is even less likely that counsel would have achieved the excellent results that respondents' counsel obtained here. Thus, had respondents had to rely on private-sector fee arrangements, they might well have been unable to obtain redress for their

---

[10] The United States suggests that "[t]he prospect of recovering $11,000 for representing [respondents] in a damages suit (assuming a contingency rate of 33%) is likely to attract a substantial number of attorneys." Brief for United States as *Amicus Curiae* 22–23. However, the District Court found that the 1,946.75 hours respondents' counsel spent litigating the case were reasonable and that "[t]here was not any possible way that you could have avoided putting in that amount of time . . . ." App. 238. We reject the United States' suggestion that the prospect of working nearly 2,000 hours at a rate of $5.65 an hour, to be paid more than 10 years after the work began, is "likely to attract a substantial number of attorneys." Brief for United States as *Amicus Curiae* 23.

grievances. It is precisely for this reason that Congress enacted § 1988.

## IV

We agree with petitioners that Congress intended that statutory fee awards be "adequate to attract competent counsel, but . . . not produce windfalls to attorneys." Senate Report, at 6. However, we find no evidence that Congress intended that, in order to avoid "windfalls to attorneys," attorney's fees be proportionate to the amount of damages a civil rights plaintiff might recover. Rather, there already exists a wide range of safeguards designed to protect civil rights defendants against the possibility of excessive fee awards. Both the House and Senate Reports identify standards for courts to follow in awarding and calculating attorney's fees, see *ibid.*; House Report, at 8; these standards are designed to ensure that attorneys are compensated only for time *reasonably expended* on a case. The district court has the discretion to deny fees to prevailing plaintiffs under special circumstances, see *Hensley*, 461 U. S., at 429 (citing Senate Report, at 4), and to award attorney's fees against plaintiffs who litigate frivolous or vexatious claims. See *Christiansburg Garment Co.* v. *EEOC*, 434 U. S. 412, 416–417 (1978); *Hughes* v. *Rowe*, 449 U. S. 5, 14–16 (1980) *(per curiam);* House Report, at 6–7. Furthermore, we have held that a civil rights defendant is not liable for attorney's fees incurred after a pretrial settlement offer, where the judgment recovered by the plaintiff is less than the offer. *Marek* v. *Chesny*, 473 U. S. 1 (1985).[11] We believe that

---

[11] Thus, petitioners could have avoided liability for the bulk of the attorney's fees for which they now find themselves liable by making a reasonable settlement offer in a timely manner. While petitioners did offer respondents $25,000 in settlement at the time the jury was deliberating the case, this offer was made, as the District Court noted, "well after [respondents' counsel] had spent thousands of dollars on preparation for trial . . . ." App. 237–238. "The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in re-

these safeguards adequately protect against the possibility that § 1988 might produce a "windfall" to civil rights attorneys.

In the absence of any indication that Congress intended to adopt a strict rule that attorney's fees under § 1988 be proportionate to damages recovered, we decline to adopt such a rule ourselves.[12]   The judgment of the Court of Appeals is hereby

*Affirmed.*

JUSTICE POWELL, concurring in the judgment.

I join only the Court's judgment.   The plurality opinion reads our decision in *Hensley* v. *Eckerhart,* 461 U. S. 424 (1983), more expansively than I would, and more expansively than is necessary to decide this case.   For me affirmance — quite simply — is required by the District Court's detailed findings of fact, which were approved by the Court of Appeals.   On its face, the fee award seems unreasonable.   But I find no basis for this Court to reject the findings made and approved by the courts below.

I

Because the history of the case is relevant to my views, I summarize it.   City police officers, without warrants, forcibly entered a private residence where respondents were attending a party and arrested four of them.   Criminal charges were lodged against those arrested, but later were dismissed.   Respondents instituted this action on June 4, 1976, against petitioners city of Riverside, its Chief of Police, and

---

sponse." *Copeland* v. *Marshall,* 205 U. S. App. D. C. 390, 414, 641 F. 2d 880, 904 (1980) (en banc).

[12] We note that Congress has been urged to amend § 1988 to prohibit the award of attorney's fees that are disproportionate to monetary damages recovered.   See *e. g.,* The Legal Fees Equity Act, S. 2802, 98th Cong., 2d Sess. (1984); S. 1580, 99th Cong., 1st Sess. (1985).   These efforts have thus far not been persuasive.

30 police officers. In addition to compensatory and punitive damages, the complaint sought preliminary and permanent injunctions against the city and its police force to prevent further alleged "discriminatory harassment" against Mexican Americans. At some point in the proceedings, respondents abandoned their claims for injunctive relief. On January 10, 1978, the District Court granted summary judgment in favor of 17 of the defendant police officers. Following extensive discovery, the case finally went to trial on September 16, 1980. After nine days of trial, and seven days of deliberations, the jury returned verdicts against the city and only five of the officers.

Specifically, the jury found that the city and three of the officers had violated 42 U. S. C. § 1983, and awarded $13,300 in compensatory and punitive damages for these civil rights violations. The jury also concluded that the city and five of the officers, including the three found to have violated § 1983, had committed numerous acts of common-law negligence, false arrest, and false imprisonment. For these state-law claims, the jury awarded damages of $20,050, bringing total damages to $33,350. Respondents sought attorney's fees under 42 U. S. C. § 1988. Their two lawyers, each having been admitted to practice for approximately five years, claimed compensation for 1,946.75 hours at a rate of $125 per hour each, and for 84.5 hours by law clerks at $25 per hour, for a total of $245,456.25. As emphasized by petitioners, this award was some seven times the amount of compensatory and punitive damages awarded.

The District Court approved in full the requested amount.[1] On appeal, petitioners challenged only the fee award, and the Court of Appeals for the Ninth Circuit affirmed. *Rivera* v. *City of Riverside*, 679 F. 2d 795 (1982). On May 31, 1983, we granted certiorari, vacated the Court of Appeals' judgment, and remanded the case for reconsideration in light of *Hensley*

---

[1] The District Court did refuse a request to double the award.

v. *Eckerhart, supra.* 461 U. S. 952 (1983). On remand, the District Court heard oral argument and "reconsidered the memoranda, affidavits, and exhibits previously filed by the parties, as well the record as a whole." App. to Pet. for Cert. 2–2. That court then made explicit findings of fact, including the following that are relevant to the fee award:

1. "All claims made by plaintiffs were based on a common core of facts. The claims on which plaintiffs did not prevail were closely related to the claims on which they did prevail. The time devoted to claims on which plaintiffs did not prevail cannot reasonably be separated from time devoted to claims on which plaintiffs did prevail."

2. "Counsel demonstrated outstanding skill and experience in handling this case."

3. "[M]any attorneys in the community would have been reluctant to institute and to continue to prosecute this action."

4. The number of hours claimed to have been expended by the two lawyers was "fair and reasonable."

5. "Counsel for plaintiffs achieved excellent results for their clients, and their accomplishment in this case was outstanding. The amount of time expended by counsel . . . was reasonable and reflected sound legal judgment under the circumstances."

6. Counsel "also served the public interest by vindicating important constitutional rights."

7. The "hourly rate [of $125 per hour is] typical of the prevailing market rate for similar services by lawyers of comparable skill, experience and reputation within the Central District at the time these services were performed."

8. Finally, in view of the level of success attained in this case, "the total number of hours expended by counsel [is] a proper basis for making the fee award." *Id.*, at 2–6 to 2–10.

Federal Rule of Civil Procedure 52(a) provides that "[f]indings of fact [by a district court] shall not be set aside unless clearly erroneous . . . ." The Court of Appeals did not disagree with any of the foregoing findings by the District Court. I see no basis on which this Court now could hold that these findings are clearly erroneous. See *Anderson* v. *Bessemer City*, 470 U. S. 564 (1985). To be sure, some of the findings fairly can be viewed as conclusions or matters of opinion, but the findings that are critical to the judgments of the courts below are objective facts. JUSTICE REHNQUIST's arguments in dissent suggest that the District Court may have been mistaken. But, as we observed in *Bessemer City*, "a reviewing court [may not] reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Id.*, at 573.

## II

I comment briefly on the principal arguments made by petitioners. They emphasize that although suit was instituted against the city, its Chief of Police, and 30 police officers, respondents prevailed only against the city and 5 of the officers. It is true that under *Hensley* fees should not be awarded for hours spent on claims as to which the plaintiffs were unsuccessful. *Hensley* also teaches, however, that where a "lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." 461 U. S., at 440. Here, the District Judge who presided throughout this protracted litigation found that the claims of respondents rested on a "common core of facts," and involved related legal theories. Since the suit was premised on one episode, the only significant variation in the facts supporting the claims against the several defendants concerned the extent of the participation by the var-

ious police officers.[2]   Petitioners offer no persuasive reason
to question the District Court's express finding that "[t]he
time devoted to claims on which plaintiffs did not prevail can-
not reasonably be separated from time devoted to claims on
which plaintiffs did prevail."   App. to Pet. for Cert. 2–6 to
2–7.

Petitioners argue for a rule of proportionality between the
fee awarded and the damages recovered in a civil rights case.
Neither the decisions of this Court nor the legislative history
of § 1988 support such a "rule."   The facts and circumstances
of litigation are infinitely variable.   Under *Hensley*, of
course, "the most critical factor [in the final determination of
fee awards] is the degree of success obtained."   461 U. S., at
436.   Where recovery of private damages is the purpose of a
civil rights litigation, a district court, in fixing fees, is obli-
gated to give primary consideration to the amount of dam-
ages awarded as compared to the amount sought.   In some
civil rights cases, however, the court may consider the vin-
dication of constitutional rights in addition to the amount of
damages recovered.   In this case, for example, the District
Court made an explicit finding that the "public interest" had
been served by the jury's verdict that the warrantless entry

---

[2] A district court should be alert in a case such as this one to consider
whether counsel, without adequate basis, may have included as defendants
persons whose conduct was too peripheral to support liability or even irrel-
evant to the substantive allegations of the complaint.   In this case, for ex-
ample, of the 30 defendant officers originally named, 17 were dismissed
prior to trial, and 8 more were cleared by the jury's verdict.   Thus, only
five—a small fraction of the number sued—were held liable.   Such a wide
difference between the number of defendants named and the number ulti-
mately found to have any responsibility for the alleged injury could raise
serious doubt as to whether counsel had reasonable grounds for suing cer-
tain defendants.   Overstating the number of defendants readily could lead
to inflation of billable hours and thus of the fee requested.   Here, how-
ever, the District Court expressly found that "[u]nder the circumstances of
this case, it was reasonable for plaintiffs initially to name thirty-one indi-
vidual defendants (thirty police officers and the chief of police)."   App. to
Pet. for Cert. 2–4.

was lawless and unconstitutional. Although the finding of a Fourth Amendment violation hardly can be considered a new constitutional ruling, in the special circumstances of this case, the vindication of the asserted Fourth Amendment right may well have served a public interest, supporting the amount of the fees awarded.[3] As the District Court put it, there were allegations that the police misconduct was "motivated by a general hostility to the Chicano community in the area . . . ." App. to Pet. for Cert. 2–8. The record also contained evidence of racial slurs by some of the police.

Finally, petitioners also contend that in determining a proper fee under § 1988 in a suit for damages the court should consider the prevailing contingent-fee rate charged by counsel in personal injury cases. The use of contingent-fee arrangements in many types of tort cases was customary long before Congress enacted § 1988. It is clear from the legislative history that § 1988 was enacted because existing fee arrangements were thought not to provide an adequate incentive to lawyers particularly to represent plaintiffs in unpopular civil rights cases. I therefore find petitioners' asserted analogy to personal injury claims unpersuasive in this context. Cf. *Memphis Community School Dist.* v. *Stachura, ante,* p. 299.

## III

In sum, despite serious doubts as to the fairness of the fees awarded in this case, I cannot conclude that the detailed findings made by the District Court, and accepted by the Court of Appeals, were clearly erroneous, or that the District Court abused its discretion in making this fee award.[4]

---

[3] It probably will be the rare case in which an award of *private damages* can be said to benefit the public interest to an extent that would justify the disproportionality between damages and fees reflected in this case.

[4] In Part III–B of its opinion, the plurality emphasizes that a primary purpose of § 1988 was to assure the availability of counsel in civil rights cases. This was an expressed and proper purpose of Congress when § 1988 was enacted a decade ago. Although the tables in the Annual Re-

CHIEF JUSTICE BURGER, dissenting.

I join JUSTICE REHNQUIST's dissenting opinion. I write only to add that it would be difficult to find a better example of legal nonsense than the fixing of attorney's fees by a judge at $245,456.25 for the recovery of $33,350 damages.

The two attorneys receiving this nearly quarter-million-dollar fee graduated from law school in 1973 and 1974; they brought this action in 1975, which resulted in the $33,350 jury award in 1980. Their total professional experience when this litigation began consisted of Gerald Lopez' 1-year service as a law clerk to a judge and Roy Cazares' two years' experience as a trial attorney in the Defenders' Program of San Diego County. For their services the District Court found that an hourly rate of $125 per hour was reasonable.

Can anyone doubt that no private party would ever have dreamed of paying these two novice attorneys $125 per hour in 1975, which, considering inflation, would represent perhaps something more nearly a $250 per hour rate today? For example, as JUSTICE REHNQUIST points out, *post*, at 590, would any private litigant be willing to pay a total of $17,875 simply for preparation of a pretrial order?

---

port of the Director of the Administrative Office are not explicit in this respect, it is clear that the increased filings of civil rights cases that began following *Monroe* v. *Pape*, 365 U. S. 167 (1961), particularly § 1983 cases, have continued and even accelerated since 1976. See 1985 Annual Report of the Director of the Administrative Office 284–299 (identifying a category of "civil rights" cases, and also a category of state prisoner petitions, many of which are § 1983 cases). These facts suggest that § 1988 is serving well Congress' purpose to assure availability of counsel, and that this purpose does not justify more generous fee awards than otherwise would be viewed as fair and reasonable.

I know of no empirical study supporting the view that aggrieved persons now have difficulty in obtaining counsel in civil rights cases. Moreover, since 1976 the number of lawyers licensed in the United States has increased from approximately 396,000, 24 Employment and Earnings 8, Table 1, United States Dept. of Labor, Bureau of Labor Statistics (1977), to an estimated 675,000, B. Curran, The Lawyer Statistical Report 4 (1985).

This fee award plainly constitutes a grave abuse of discretion which should be rejected by this Court—particularly when we have already vacated and remanded this *identical* fee award previously—rather than simply affirming the District Court's findings as not being either "clearly erroneous" or an "abuse of discretion." See *ante*, at 572–573. The Court's result will unfortunately only add fuel to the fires of public indignation over the costs of litigation.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join, dissenting.

In *Hensley* v. *Eckerhart*, 461 U. S. 424, 433 (1983), our leading case dealing with attorney's fees awarded pursuant to 42 U. S. C. § 1988, we said that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." As if we had foreseen the case now before us, we went on to emphasize that "[t]he district court . . . should exclude from this initial fee calculation hours that were not 'reasonably expended'" on the litigation. *Id.*, at 434, quoting S. Rep. No. 94–1011, p. 6 (1976). Today, despite its adoption of a revisionist interpretation of *Hensley*, the plurality nonetheless acknowledges that "*Hensley* requires a fee applicant to exercise 'billing judgment' not because he should necessarily be compensated for less than the actual number of hours spent litigating a case, but because the hours he does seek compensation for must be *reasonable*." *Ante*, at 569, n. 4 (emphasis in original). I see no escape from the conclusion that the District Court's finding that respondents' attorneys "reasonably" spent 1,946.75 hours to recover a money judgment of $33,350 is clearly erroneous, and that therefore the District Court's award of $245,456.25 in attorney's fees to respondents should be reversed. The Court's affirmance of the fee award emasculates the principles laid down in *Hensley*, and turns § 1988 into a relief Act for lawyers.

A brief look at the history of this case reveals just how "unreasonable" it was for respondents' lawyers to spend so much time on it. Respondents filed their initial complaint in 1976, seeking injunctive and declaratory relief and compensatory and punitive damages from the city of Riverside, its Chief of Police, and 30 police officers, based on 256 separate claims allegedly arising out of the police breakup of a single party. Prior to trial, 17 of the police officers were dismissed from the case on motions for summary judgment, and respondents dropped their requests for injunctive and declaratory relief. More significantly, respondents also dropped their original allegation that the police had acted with discriminatory intent. The action proceeded to trial, and the jury completely exonerated nine additional police officers. Respondents ultimately prevailed against only the city and five police officers on various § 1983, false arrest and imprisonment, and common negligence claims. No restraining orders or injunctions were ever issued against petitioners, nor was the city ever compelled to change a single practice or policy as a result of respondents' suit. The jury awarded respondents a total of $33,350 in compensatory and punitive damages. Only about one-third of this total, or $13,300, was awarded to respondents based on violations of their federal constitutional rights.

Respondents then filed a request for $495,713.51 in attorney's fees, representing approximately 15 times the amount of the underlying money judgment. In April 1981, the District Court made its initial fee award of $245,456.25, declining to apply respondents' requested "multiplier," but awarding, to the penny, the entire "lodestar" claimed by respondents and their attorneys. The Ninth Circuit affirmed, *Rivera* v. *City of Riverside*, 679 F. 2d 795 (1982). We granted certiorari, vacated, and remanded, 461 U. S. 952 (1983), in light of *Hensley, supra*. On remand, the District Court convened a hearing, at which the court promptly announced: "I tell you now that I will not change the award. I will simply go back and be more specific about it." App. 230. The court ulti-

mately proved true to its word. After reviewing the record and the submissions of the parties, the court convened a second hearing, at which it approved exactly the same award as before: $245,456.25 in attorney's fees. The only noticeable change was that, the second time around, the court created a better "paper trail" by including in its order a discussion of those factors in *Hensley* and *Johnson* v. *Georgia Highway Express, Inc.*, 488 F. 2d 714 (CA5 1974), which it believed supported such a huge fee award. See App. 187–192. The Ninth Circuit again affirmed, 763 F. 2d 1580 (1985).

It is obvious to me that the District Court viewed *Hensley* not as a constraint on its discretion, but instead as a blueprint for justifying, in an after-the-fact fashion, a fee award it had already decided to enter solely on the basis of the "lodestar." In fact, the District Court failed at almost every turn to apply any kind of "billing judgment," or to seriously consider the "results obtained," which we described in *Hensley* as "the important factor" in determining a "reasonable" fee award. 461 U. S., at 434. A few examples should suffice: (1) The court approved almost 209 hours of "prelitigation time," for a total of $26,118.75. (2) The court approved some 197 hours of time spent in conversations between respondents' two attorneys, for a total of $24,625. (3) The court approved 143 hours for preparation of a pretrial order, for a total of $17,875. (4) Perhaps most egregiously, the court approved 45.50 hours of "stand-by time," or time spent by one of respondents' attorneys, who was then based in San Diego, to wait in a Los Angeles hotel room for a jury verdict to be rendered in Los Angeles, where his co-counsel was then employed by the U. C. L. A. School of Law, less than 40 minutes' driving time from the courthouse. The award for "stand-by time" totaled $5,687.50. I find it hard to understand how any attorney can be said to have exercised "billing judgment" in spending such huge amounts of time on a case ultimately worth only $33,350.

Indeed, on the basis of some of the statements made by the District Court in this case, I reluctantly conclude that the court may have attempted to make up to respondents in attorney's fees what it felt the jury had wrongfully withheld from them in damages. As the court noted in its opinion, apparently believing that the observation supported the entry of a huge award of attorney's fees:

> "[T]he size of the jury award resulted from (a) the general reluctance of jurors to make large awards against police officers, and (b) the dignified restraint which the plaintiffs exercised in describing their injuries to the jury. For example, although some of the actions of the police would clearly have been insulting and humiliating to even the most insensitive person and were, in the opinion of the Court, intentionally so, plaintiffs did not attempt to play up this aspect of the case." App. 188–189.

But a district court, in awarding attorney's fees under § 1988, does not sit to retry questions submitted to and decided by the jury. If jurors are reluctant to make large awards against police officers, this is a fact of life that plaintiffs, defendants, and district courts must live with, and a district court simply has no business trying to correct what it regards as an unfortunate tendency in the award of damages by granting inflated attorney's fees.

The analysis of whether the extraordinary number of hours put in by respondents' attorneys in this case was "reasonable" must be made in light of both the traditional billing practices in the profession, and the fundamental principle that the award of a "reasonable" attorney's fee under § 1988 means a fee that would have been deemed reasonable if billed to affluent plaintiffs by their own attorneys. This latter principle was stressed in the legislative history of § 1988, see

S. Rep. No. 94–1011, p. 6 (1976),\* and by this Court in *Hensley:*

> "Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. 'In the private sector, "billing judgment" is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.'" 461 U. S., at 434, quoting *Copeland* v. *Marshall*, 205 U. S. App. D. C. 390, 401, 641 F. 2d 880, 891 (1980) (en banc) (emphasis in original).

I think that this analysis, which appears nowhere in the plurality's opinion, leads inexorably to the conclusion that the District Court's fee award of $245,456.25, based on a prevailing hourly rate of $125 multiplied by the number of hours which respondents' attorneys claim to have spent on the case, is not a "reasonable" attorney's fee under § 1988.

Suppose that A offers to sell Blackacre to B for $10,000. It is commonly known and accepted that Blackacre has a fair market value of $10,000. B consults an attorney and requests a determination whether A can convey good title to Blackacre. The attorney writes an elaborate memorandum concluding that A's title to Blackacre is defective, and submits a bill to B for $25,000. B refuses to pay the bill, the attorney sues, and the parties stipulate that the attorney spent 200 hours researching the title issue because of an extraordinarily complex legal and factual situation, and that

---

\* "In computing the fee, counsel for prevailing parties should be paid, *as is traditional with attorneys compensated by a fee-paying client,* 'for all time *reasonably* expended on a matter.'" S. Rep. No. 94–1011, p. 6 (1976) (emphasis added), quoting *Van Davis* v. *County of Los Angeles*, 8 EPD ¶ 9444 (CD Cal. 1974); *Stanford Daily* v. *Zurcher*, 64 F. R. D. 680, 684 (ND Cal. 1974).

the prevailing rate at which the attorney billed, which was also a "reasonable" rate, was $125. Does anyone seriously think that a court should award the attorney the full $25,000 which he claims? Surely a court would start from the proposition that, unless special arrangements were made between the client and the attorney, a "reasonable" attorney's fee for researching the title to a piece of property worth $10,000 could not exceed the value of the property. Otherwise the client would have been far better off never going to an attorney in the first place, and simply giving A $10,000 for a worthless deed. The client thereby would have saved himself $15,000.

Obviously the billing situation in a typical litigated case is more complex than in this bedrock example of a defective title claim, but some of the same principles are surely applicable. If A has a claim for contract damages in the amount of $10,000 against B, and retains an attorney to prosecute the claim, it would be both extraordinary and unjustifiable, in the absence of any special arrangement, for the attorney to put in 200 hours on the case and send the client a bill for $25,000. Such a bill would be "unreasonable," regardless of whether A obtained a judgment against B for $10,000 or obtained a take-nothing judgment. And in such a case, where the prospective recovery is limited, it is exactly this "billing judgment" which enables the parties to achieve a settlement; any competent attorney, whether prosecuting or defending a contract action for $10,000, would realize that the case simply cannot justify a fee in excess of the potential recovery on the part of either the plaintiff's or the defendant's attorney. All of these examples illuminate the point made in *Hensley* that "the important factor" in determining a "reasonable" fee is the "results obtained." 461 U. S., at 434. The very "reasonableness" of the hours expended on a case by a plaintiff's attorney necessarily will depend, to a large extent, on the amount that may reasonably be expected to be recovered if the plaintiff prevails.

The amount of damages which a jury is likely to award in a tort case is of course more difficult to predict than the amount it is likely to award in a contract case. But even in a tort case some measure of the kind of "billing judgment" previously described must be brought to bear in computing a "reasonable" attorney's fee. Again, a hypothetical example will illustrate the point. If, at the time respondents filed their lawsuit in 1976, there had been in the Central District of California a widely publicized survey of jury verdicts in this type of civil rights action which showed that successful plaintiffs recovered between $10,000 and $75,000 in damages, could it possibly be said that it would have been "reasonable" for respondents' attorneys to put in on the case hours which, when multiplied by the attorneys' prevailing hourly rate, would result in an attorney's fee of over $245,000? In the absence of such a survey, it might be more difficult for a plaintiff's attorney to accurately estimate the amount of damages likely to be recovered, but this does not absolve the attorney of the responsibility for making such an estimate and using it as a guide in the exercise of "billing judgment."

In the context of § 1988, there would obviously be some exceptions to the general rules of "billing judgment" which I have been discussing, but none of these exceptions are applicable here. If the litigation is unnecessarily prolonged by the bad-faith conduct of the defendants, or if the litigation produces significant, identifiable benefits for persons other than the plaintiffs, then the purpose of Congress in authorizing attorney's fees under § 1988 should allow a larger award of attorney's fees than would be "reasonable" where the only relief is the recovery of monetary damages by individual plaintiffs. Nor do we deal here with a case such as *Carey* v. *Piphus*, 435 U. S. 247, 266 (1978), in which the deprivation of a constitutional right necessarily results in only nominal pecuniary damages. See S. Rep. No. 94–1011, *supra*, at 6 (fee awards under § 1988 should "not be reduced because the rights involved may be nonpecuniary in nature"). Here, re-

spondents successfully claimed both compensatory and punitive damages for false arrest and imprisonment, negligence, and violations of their constitutional rights under the Fourth and Fourteenth Amendments, and the jury assessed damages as juries do in such cases. In short, this case shares none of the special aspects of certain civil rights litigation which the plurality suggests, in Part III of its opinion, would justify an award of attorney's fees totally divorced from the amount of damages awarded by the jury.

The plurality, *ante*, Part III, at 573–574, explains the position advanced by petitioner and the United States concerning fee awards in a case such as this, and then goes on to "reject the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers." *Ante*, at 574. I agree with the plurality that the importation of the contingent-fee model to govern fee awards under § 1988 is not warranted by the terms and legislative history of the statute. But I do not agree with the plurality if it means to reject the kind of "proportionality" that I have previously described. Nearly 2,000 attorney-hours spent on a case in which the total recovery was only $33,000, in which only $13,300 of that amount was recovered for the federal claims, and in which the District Court expressed the view that, in such cases, juries typically were reluctant to award substantial damages against police officers, is simply not a "reasonable" expenditure of time. The snippets of legislative history which the plurality relies upon to dismiss *any* relationship between the amount of time put in on a case and the amount of damages awarded are wholly unconvincing. One may agree with all of the glowing rhetoric contained in the plurality's opinion about Congress' noble purpose in authorizing attorney's fees under § 1988 without concluding that Congress intended to turn attorneys loose to spend as many hours as possible to prepare and try a case that could reasonably be expected to result only in a relatively minor award of monetary damages.

In *Hensley*, we noted that "complex civil rights litigation involving numerous challenges to institutional practices or conditions" might well require "many hours of lawyers' services," and thus justify a large award of attorney's fees. 461 U. S., at 436. This case is a far cry from the situation we referred to in *Hensley*. I would reverse the judgment of the Ninth Circuit affirming the District Court's award of attorney's fees, and remand the case to the District Court for recomputation of the fee award in light of both *Hensley* and the principles set forth in this opinion.