OPINION
{¶ 1} Plaintiff-appellant Village of Byesville, Ohio, appeals from the February 11, 2003, entry of the Guernsey County Court of Common Pleas granting plaintiff-appellant attorney's fees in the amount of $12,500.00.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant Village of Byesville operates a public water system to provide potable and drinking water for residential and commercial use. On May 1, 2002, appellant filed a Verified Complaint for Injunctive Relief and Motion for Temporary Restraining Order against appellee Northshore Coal, Inc. and E.K. Development. Appellant, in its complaint, alleged that both parties had, as a result of their mining activities, caused appellant's water production wells to dry up, forcing appellant to purchase water from another source until its water supply was restored. Appellant specifically alleged that the parties, during their mining activities, had breached deep mines full of water and that the pit excavated by the parties in order to surface mine coal had filled with the same. According to appellant, the parties, while pumping the water out of the pit, withdrew ground waters in such a manner as to cause appellant's wells to run dry.
 {¶ 3} As memorialized in an entry filed on May 2, 2002, the trial court granted a temporary restraining order and set the matter for a preliminary injunction hearing on May 15, 2002. On May 15, 2002, the parties entered into a settlement agreement regarding the issues related to appellant's request for a preliminary injunction. Via an Agreed Judgment Entry filed on May 22, 2002, the parties agreed, in part, as follows:
 {¶ 4} "1. The Temporary Restraining Order previously issued by this Court shall be extended until such time that the within Entry has been journalized.
 {¶ 5} "2. The Defendants may continue to de-water the mine site under its existing permit [from the Ohio Department of Natural Resources] throughout the pendency of the within action, on the condition that said de-watering activities be limited to the elimination or removal of "surface water" that accumulates in or around the mining area. The term "surface water", for purposes of the within Entry, shall be defined as any water that accumulates in and around the mining area with the exception of water that may enter the mining area from abandoned, underground mine shafts in the vicinity of the site.
 {¶ 6} "3. Consideration of the Plaintiff's request for a preliminary injunction shall be deferred until such time that either party petitions the Court for consideration of the same. Upon any such petition, this Court will schedule a hearing in an expeditious fashion in keeping with the Court's regular docket. In the event that the Defendants interrupt or otherwise breach an abandoned, underground mine shaft during its operation, they shall refrain from de-watering activities until such time that they have petitioned this Court for consideration of the issues raised by Plaintiff in its request for injunctive relief."
 {¶ 7} Thereafter, on August 9, 2002, appellant filed a Motion to Show Cause, alleging that the parties had violated the settlement agreement and court order by pumping significant amounts of water from the deep mines. The trial court scheduled an evidentiary hearing on such motion.
 {¶ 8} Appellant, on September 9, 2002, filed a Motion for Default Judgment against appellee Northshore Coal, alleging that appellee had failed to file an answer or otherwise respond to appellant's complaint.
 {¶ 9} Subsequently, an evidentiary hearing on appellant's Motion to Show Cause was held on September 10, 2002. Pursuant to an entry filed on September 11, 2002, the trial court denied the Motion to Show Cause, finding that "the evidence before this Court at this time is equally balanced. While the Village may yet prevail at the final hearing on the merits of this matter, the Court finds that there is insufficient evidence at this time for the Court to issue contempt citation or preliminary injunction." The trial court, in its entry, scheduled a two day hearing commencing on October 2, 2002.
 {¶ 10} Via an entry filed on September 27, 2002, the trial court granted appellant's Motion for a Default Judgment against appellee Northshore Coal. The trial court scheduled an evidentiary hearing "as to the proper amount of unliquidated damages and equitable relief" for October 2, 2002, the scheduled trial date.
 {¶ 11} Thereafter, a two day trial commenced on October 2, 2002. When asked, at the commencement of the trial, how he wished to proceed with respect to the default judgment against appellee Northshore Coal, counsel for appellant responded as follows:
 {¶ 12} "Your Honor, with respect to the issue of damages, the damages asserted against Northshore are the same damages asserted against the defendant E.K. Development. So we could either proceed now and present damages — — evidence of damages or we could enter the damages into the record in the E.K. Development case-in-chief and assert those damages. The damages would be two parts — the attorney and expert witness fees and then the damages incurred by the Village by not being able to sell water to its customers." Transcript at 7.
 {¶ 13} The trial court, in response, stated on the record as follows:
 {¶ 14} "I find to permit the plaintiff to proceed now would in essence bifurcate the case and require the Court to hear the same evidence twice that relates to damages. I will permit you to refresh the Judge's recollection at the conclusion of the case. You will advise me that your damages are being sought on the default judgment also." Transcript at 8.
 {¶ 15} After the conclusion of the trial, the parties, at the request of the trial court, submitted proposed findings of fact and conclusions of law. As memorialized in a Decision and Judgment Entry filed on December 9, 2002, the trial court granted appellant judgment against E.K. Development and issued a permanent injunction enjoining E.K. Development, its agents or assigns "from pumping water directly from deep mines which serve the aquifer for the Village of Byesville." The trial court, in its decision, awarded appellant damages in the amount of $114,399.40, plus attorney's fees in the amount of $12,500.00 and $31,495.79 in expert witness fees and expenses. Appellant had sought a total of $143,992.55 in attorney fees. The trial court, in its entry, stated, in relevant part, as follows:
 {¶ 16} "The Court finds that the Village incurred attorney fees in the amount of $143,992.55 in prosecuting this action through October 1, 2002. The Court finds (applying the standards of DR 2-106) that these fees are in excess of a reasonable fee. The Court finds (based upon the testimony of Attorney William M. Bennett) that a reasonable attorney's fee in Guernsey County would be $125 per hour. In his opinion, presentation of the case would involve 50 — 100 hours — which would equal reasonable attorneys' fees in the range of $6,250 to $12,500 — which the Court finds is comparable to the attorneys' fees incurred by Defendant (Which were stated by Attorney Wildman to $9,000). The Court finds that no showing has been made that would permit this Court to conclude attorneys' fees in the sum of $143,992.55 (compared to the damages sought of $114,399.40) is either reasonable or necessary. The Court finds that the experience, reputation and ability of Attorney Hughes are not in question and the results obtained were favorable to his client. However, the amount of attorneys' fees is excessive when compared to the amount involved and damages presented. The Court further finds that even on the basis of a 1/3 contingency fee, the attorneys' fees charged in this case would be excessive."
 {¶ 17} Subsequently, appellant, on January 10, 2003, filed a Motion for Damages against appellee. Appellant, in its motion, specifically moved the trial court for an order that "assesses the damages determined at trial to be applied against Defendant, Northshore Coal, Inc." Pursuant to an entry filed on February 11, 2003, the trial court granted appellant judgment against appellee Northshore Coal, Inc. in the amount of $114,399.40, plus attorney's fees in the amount of $12,500.00[1] and $31,495.79 in expert witness fees and expenses.
 {¶ 18} It is from the trial court's February 11, 2003, entry that appellant now appeals, raising the following assignments of error:
 {¶ 19} "I. THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING APPELLANT $12,500.00 IN ATTORNEY FEES AS THERE IS NO COMPETENT, CREDIBLE EVIDENCE TO SUPPORT AN AWARD IN THAT AMOUNT, ESPECIALLY WHEN APPELLANT INCURRED $143,992.55 IN ATTORNEYS' FEES TO OBTAIN COMPLETE RELIEF AND AN UNFETTERED VICTORY ON ALL CLAIMS ASSERTED IN THE LAWSUIT, INCLUDING INJUNCTIVE RELIEF, DAMAGES, EXPERT WITNESS FEES AND COSTS.
 {¶ 20} "II. THE TRIAL COURT ERRED AS A MATTER OF LAW BY APPLYING THE PROPORTIONALITY TEST WHEN DETERMINING THE REASONABLENESS."
 {¶ 21} This case comes to us on the accelerated calendar. Appellate Rule 11.1, which governs accelerated calendar cases, provides, in pertinent part: (E) Determination and judgment on appeal. The appeal will be determined as provided by App.R. 11. 1. It shall be sufficient compliance with App.R. 12(A) for the statement of the reason for the court's decision as to each error to be in brief and conclusionary form. The decision may be by judgment entry in which case it will not be published in any form.
 {¶ 22} This appeal shall be considered in accordance with the aforementioned rule.
 I, II {¶ 23} Appellant, in its two assignments of error, challenges the trial court's award of attorney fees in the amount of $12,500.00. Appellant specifically contends that the trial court abused its discretion in ordering appellee Northshore Coal[2] to pay appellant $12,500.00 in attorney's fees, as opposed to the $143,992.55 requested, when there was no competent, credible evidence supporting an award in such an amount and that the trial court erred by applying the proportionality test when determining the reasonableness of appellant's attorney's fees.
 {¶ 24} The appropriate amount of attorney fees to award in a given case rests in the sound discretion of the trial court. See Bittner v.Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143, 146, 569 N.E.2d 464,467. Thus, a reviewing court should not reverse a trial court's determination as to the amount of attorney fees absent an abuse of that discretion. Id. at 146. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140.
 {¶ 25} In Bittner, supra., the Ohio Supreme Court described the proper procedure a trial court is to follow when determining the amount of reasonable fees to award: "[T]he trial court should first calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by application of the factors listed in DR 2-106(B)." Bittner, at 145. After calculating this starting figure, or "lodestar," the court may then modify the amount upward or downward by application of the various factors listed in DR 2-106(B). The factors in DR 2-106(B) are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.
 {¶ 26} The trial court, in the case sub judice, relied on the testimony of Attorney William Bennett in determining what constituted reasonable attorney's fees. Attorney Bennett, a general practice attorney in Guernsey County, testified at the October, 2002, hearing that he was unfamiliar with the nature of the case and that he had not read the pleadings that had been filed in the same. During direct examination, when asked whether he knew that this case involved strip mining, Attorney Bennett responded "[j]ust generally." Transcript at 340. When asked on direct examination what would be a reasonable charge, Attorney Bennett responded: "Now give me some idea of how many hours you are talking about because that's really the essence of it all." Transcript at 340. Moreover, when he was also questioned about how unreasonable appellant's request for a total of $143,992.55 in attorney's fees was, Attorney Bennett indicated that he did not "know how you would quantify that. I think any answer I give to that would just be simply something I pull out of the sky." Transcript at 341.
 {¶ 27} The following is an excerpt from Attorney Bennett's testimony on cross-examination:
 {¶ 28} "Q. Mr. Bennett, good afternoon.
 {¶ 29} "A. It is.
 {¶ 30} "Q. I appreciate your coming here today and I just wanted to confirm that your statement that you're not aware of the complexity of the issues in this case, are you?
 {¶ 31} "A. No. As I indicated, my singular involvement was that day, that one day, I was here for the initial hearing.
 {¶ 32} "Q. You haven't reviewed the pleadings filed?
 {¶ 33} "A. Absolutely not.
 {¶ 34} "Q. You haven't reviewed the entire bill provided by Bricker Eckler to the defendants in this case, have you?
 {¶ 35} "A. Yeah. The bill that I have — —
 {¶ 36} "Q. I'm asking you if you've reviewed the entire bill?
 {¶ 37} "A. Yes. Well, if this is the entire bill what I'm holding here. You might want to look at it. The affidavits that are attached and the graphs but I have reviewed that entire report, yes.
 {¶ 38} "Q. But you're not aware of the nature of the issues involved in the lawsuit, is that correct?
 {¶ 39} "A. No, I am not.
 {¶ 40} "Q. That goes to whether it's necessary. So really youropinion as to whether or not the fees charged to the Village Byesville arenecessary you don't really know?
 {¶ 41} "A. No. It would be more based on what a normal —what normal litigation would cost or how many hours it would take tohandle a case. We all know after doing it so many years about how manyhours it's going to take.
 {¶ 42} "Q. You don't know whether this particular case fitsinto the category of normal?
 {¶ 43} "A. No, I do not.
 {¶ 44} "Q. With respect to reasonableness, are you aware of the rate structure in Columbus, Ohio?
 {¶ 45} "A. I saw the graphs and I read the affidavits, yes. That's the extent of my knowledge.
 {¶ 46} "Q. You would agree that that rate structure is different than the rate structure in Guernsey County?
 {¶ 47} "A. Absolutely and paralegals probably charge more than the lawyers do here.
 {¶ 48} "Q. Do you have any reason to disagree with Mr. King's affidavit, the Chief Operating Officer, of Bricker Eckler?
 {¶ 49} "A. No. Like I started my testimony, I know it's a totally different world.
 {¶ 50} "Q. You wouldn't have any reason to agree with the Altman Weil study cited in Mr. King's affidavit that determines what the reasonable fees are for a law firm the size of Bricker Eckler would be in a community?
 {¶ 51} "A. No I have no reason to dispute that." Transcript at 344-346. (Emphasis added).
 {¶ 52} Based on the foregoing, we find that there was no competent, credible evidence supporting the trial court's award of $12,500.00 in attorney's fees to appellant and that the trial court, in awarding such an amount based on Attorney Bennett's testimony, abused its discretion. By his own admission, Attorney Bennett had not reviewed the case pleadings and was unfamiliar with the nature and complexity of the case. Furthermore, while the trial court applied the prevailing rates in Guernsey County to determine reasonable attorney's fees, custom and prevailing rates in a locality are by no means conclusive and may be disregarded when the litigation is, as here, highly specialized or complex. See, for example, Freeman v. Crown City Mining (1993),90 Ohio App.3d 546, 555, 630 N.E.2d 19. (Also an environmental litigation case).
 {¶ 53} As is stated above, appellant also argues that the trial court erred in applying the proportionality test. The trial court, in its entry, implied that it found appellant's request for a total of $143,992.55 in attorney fees unreasonable in relation to the amount of damages ($114,399.40) sought. However, as noted by appellant, the amount of attorney's fees need not be proportionate to the amount of damages in certain cases. "A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious * * * claims but relatively small potential damages to obtain redress from the courts * * *."Riverside v. Rivera (1986), 477 U.S. 561, 578, 106 S.Ct. 2686,91 L.Ed.2d 466. As noted by appellant in its brief, R.C. 1513.15(H), the section authorizing an award of attorney's fees in this case, was enacted for the protection of individuals from the unreasonable use of groundwater by their neighbors. As appellant notes, "It is not unusual for the damages at issue to pale in comparison to the attorney fees necessary for water users to mount a successful case ".
 {¶ 54} Appellant's first and second assignments of error are, therefore, sustained.
 {¶ 55} Accordingly, the judgment of the Guernsey County Court of Common Pleas is reversed and this matter is remanded to the trial court for further proceedings.
By: Edwards, J., Gwin, P.J., and Wise, J. concur.
[1] The attorney's fees were pursuant to R.C. 1513.13(H).
[2] E.K. Development Co. is not a party to this appeal since the judgments rendered against E.K. Development were satisfied.