**Thsia BRIGGINS, Plaintiff,**

v.

**ELWOOD TRI, INC. and Honda Manufacturing of Alabama, LLC, Defendants.**

**Civil Action No. 1:08–CV–1861–KOB.**

United States District Court, N.D. Alabama, Eastern Division.

Signed March 11, 2014.

Robert J. Camp, Candis A. McGowan, Daniel P. Evans, Robert L. Wiggins, Jr., Wiggins Childs Quinn & Pantazis LLC, Birmingham, AL, for Plaintiff.

Lia Elliott, Elwood Staffing Services Inc., Columbus, IN, Whitney R. Brown, David J. Middlebrooks, Matthew W. Stiles, Lehr Middlebrooks & Vreeland PC, Ronald W. Flowers, Jr., Kathryn Morris Willis, Marcel L. Debruge, Ronald D. Scott Williams, Eddie T. Ramey, Henry C. Hilson, Ronald W. Flowers, Jr., Ryan M. Aday, Burr & Forman LLP, Birmingham, AL, for Defendants.

### *MEMORANDUM OPINION REGARDING ORDER APPROVING SETTLEMENT*

KARON OWEN BOWDRE, Chief Judge.

On February 7, 2014, the magistrate judge filed his report and recommendation concerning the proposed approval of a compromise settlement reached by the parties in this and 201 related cases assigned to the undersigned district judge[1], as well as in 385 other cases involving and

---

1. *See* Attachment "A" to the Final Order filed contemporaneously with this memorandum opinion.

related to the action in *Cedric Burroughs v. Honda Manufacturing of Alabama, LLC*, Case No. 1:08–cv–1239–VEH assigned to a different district judge.[2] The court notes that the settlement agreement is the product of not only cooperation among counsel and the parties, but also the exhaustive mediation efforts of Magistrate Judge Putnam. The court commends Judge Putnam and counsel for their good work.

Prior to the filing of his report and recommendation, the magistrate judge entered orders requiring plaintiffs' counsel to notify the individual plaintiffs of the terms and conditions of the proposed settlement, including the procedures for objecting to the proposed settlement and the back-pay recoveries each plaintiff should expect to receive under the settlement. Notification was mailed to each plaintiff by counsel on or soon after November 12, 2013 (*see* doc. 253, p. 5), expressly advising each plaintiff of the right to appear personally and object to the proposed settlement at a fairness hearing scheduled on December 10, 2013. On December 10, 2013, the magistrate judge convened the fairness hearing pursuant to *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982), but no plaintiffs or persons purporting to speak for any of them appeared at the hearing. No one submitted written objections to the proposed settlement to the court.

Following the December 10 fairness hearing, the magistrate judge filed his report and recommendation on February 7, 2014, recommending generally that the proposed settlement be approved by the court, with the exception of two provisions. The magistrate judge recommended that the court reject approval of Paragraph 9 of the proposed settlement agreement[3], which would require that the agreement and its terms remain confidential. The magistrate judge also recommended that the court reject approval of a portion of Paragraph 10, which would impose on any late-objecting plaintiff the fees and costs incurred by defendants in filing any motion to enforce the settlement agreement against such a plaintiff. The magistrate judge also found that the fees to be awarded plaintiffs' counsel are reasonable in the circumstances of these cases, and he recommended approval of the fee award.

■ To date, no party has filed an objection to the report and recommendation. The court has carefully reviewed and considered *de novo* the report and recommendation, as well as the materials submitted by the parties in support of the proposed settlement, and the court finds that the report is due to be and hereby is ADOPTED and the recommendations in it ACCEPTED. The court agrees that the proposed settlement is a fair and adequate compromise of the genuinely contested claims of overtime pay by the plaintiffs. For the reasons explained by the magistrate judge, the claims of overtime were genuinely disputed both as to entitlement to any overtime compensation and the amounts that might be owed. The parties reached a fair and adequate compromise to resolve disputes over whether any overtime pay was due each plaintiff, whether it is possible to accurately quantify any overtime each plaintiff may claim, and, by extension, whether plaintiffs are entitled to any liquidated damages. The court agrees that the negotiated fees and expenses of plaintiffs' counsel are fair and reasonable

---

2. The Final Order Approving Settlement and Dismissing Action is entered only in this case and the 201 related cases assigned to the undersigned. It does not purport of resolve the other 385 cases assigned Judge Hopkins.

3. *See* Attachment "B" to the Final Order filed contemporaneously with this memorandum opinion.

and do not reduce the amount each plaintiff is entitled to receive under the settlement.

■ The court also agrees with the magistrate judge that Paragraph 9 and a part of Paragraph 10 of the proposed settlement agreement should be rejected. The court agrees with the observation made by Judge Thompson that "[a]bsent some compelling reason, the sealing from public scrutiny of FLSA agreements between employees and employers would thwart the public's independent interest in assuring that employees' wages are fair and thus do not endanger 'the national health and well-being.'" *Hogan v. Allstate Beverage Co.*, 821 F.Supp.2d 1274, 1283 (M.D.Ala.2011) quoting *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 708, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). Confidentiality provisions may not be extracted as a part of the price of compromise, "for they prevent the employee from alerting other workers to potential FLSA violations on pain of personal liability" and by enabling the employer to " 'retaliate against an employee for exercising FLSA rights' by advising other employees of FLSA violations." *Hogan v. Allstate Beverage Co.*, 821 F.Supp.2d 1274, 1284 (M.D.Ala.2011). To uphold such provisions, the proponents must show "compelling reasons," *Crabtree v. Volkert, Inc.*, 2013 WL 593500, *4 (S.D.Ala. Feb. 14, 2013), which simply have not been shown to exist in these cases.

■ Likewise, that part of Paragraph 10 that allows the defendants to seek their fees and expenses incurred in connection with any motion to enforce the settlement against any plaintiff that balks at fulfilling it unduly undermines the voluntariness of the compromise achieved and extracts a price for recognition of the plaintiffs' FLSA rights, particularly as to those plaintiffs who can establish that they were unaware of the proposed settlement. As to plaintiffs who are unaware of the proposed settlement or otherwise were prevented from expressing opposition, imposing fees and costs on them to oppose the settlement later when they learn of it violates their due process rights. Thus, the court will reject that part of Paragraph 10 allowing defendants to seek fees and expenses for enforcement motions as to those plaintiffs who can establish they were unaware of the settlement or otherwise prevented from stating their objections to it until after this date.

■ Further, the court expressly finds that the proposed attorneys' fees and expenses due to plaintiffs' counsel under the proposed settlement agreement, as set out in the magistrate judge's report and recommendation, are fair and reasonable. In doing so, the court takes into account the "lodestar" method of calculating fees and the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The fees and expenses determined by the magistrate judge in the report and recommendation are hereby ADOPTED as the court's own fee/expense award. In the separate Final Order Approving Settlement, the court will award to plaintiffs' counsel the fees, costs, and expenses consistent with the settlement agreement, as set out in the magistrate judge's report and recommendation.

By separate Final Order Approving Settlement and Dismissing Action, the court will approve the proposed settlement agreement, except with respect to Paragraph 9 and that portion of Paragraph 10 that would allow defendants to seek fees and expenses for any motion to enforce the settlement from any plaintiff able to show that he did not know about or have a reasonable opportunity to object to the settlement prior to this date.[4] The parties

---

4. To be clear, that portion of Paragraph 10 remains valid and effective as to those plain-

may proceed with execution of the settlement agreement, and the court will dismiss with prejudice all actions listed in Attachment "A" to the Final Order filed contemporaneously with this memorandum opinion.

## REPORT AND RECOMMENDATION

T. MICHAEL PUTNAM, United States Magistrate Judge.

These two lead cases, as well as the 585 other individual cases listed in Attachments A and B hereto, came before the court on December 10, 2013, on reference from the respective district judges, for a settlement fairness hearing pursuant to *Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350 (11th Cir.1982). On December 5, 2013, counsel representing all parties filed a "Joint Motion for Approval of Settlement Agreement and Dismissal with Prejudice," with which simultaneously was submitted to the undersigned an *in camera* copy of the proposed settlement agreement. Having carefully considered the proposed settlement agreement and the presentations made by counsel at the fairness hearing, and in light of the lack of objections to the proposed settlement, the magistrate judge recommends that the settlement be approved, as explained below.

### I. *Procedural History*

These actions began on July 14, 2008, with the filing of a complaint in *Burroughs v. Honda Manufacturing of Alabama, LLC,* Case No. 1:08–cv–1239–VEH, on behalf of plaintiff Cedric Burroughs, alleging a claim for unpaid overtime under the Fair Labor Standards Act ("FLSA"). A week later, on July 22, 2008, an amended complaint was filed on behalf of Burroughs and "others similarly situated." Pleaded as a representative action, the amended complaint alleged that defendant Honda

"uniformly denie[d] overtime premium pay to its employees by requiring 'non-exempt' employees to work off the clock before their shift starts and while on their unpaid meal break." Over the next several months, dozens of additional plaintiffs opted in to the case. After motions and briefing, on April 6, 2009, the court granted the plaintiffs' motion to conditionally certify an opt-in class of all "current and former hourly, nonexempt production employees from the following [Honda] departments: Assembly Frame, Engine Assembly, Paint, PMC, Weld, and Vehicle Quality."

After more than two years of discovery and motion practice, Honda filed a motion to decertify the collective action on September 6, 2011. Again, extensive briefing and additional motion practice took place before, on July 19, 2012, the court granted the motion to certify the collective action, requiring the hundreds of plaintiffs who had opted in to the case to file their own separate individual claims. After several plaintiffs were dismissed for various reasons, the remaining group of individually prosecuted FLSA actions became known loosely as the "Burroughs class," composed of 385 workers employed by Honda Manufacturing of Alabama.

In the meantime, on October 8, 2008, the complaint in *Thsia Briggins v. Elwood TRI, Inc., et al.,* Case No. 1:08–cv–1861–KOB, was filed against Honda and a supplier of temporary workers, Elwood TRI, alleging the Honda and Elwood Tri jointly employed workers used in the Honda plant, and that both defendants "uniformly den[ied] overtime premium pay to their employees by requiring 'non-exempt' employees to work off the clock before their shift starts and while on their unpaid meal break." As in *Burroughs,* dozens of "temp. workers" used at the Honda plant

tiffs who learned or knew of the proposed settlement and had a reasonable opportunity

to object to it prior to the date of this approval of the settlement.

opted in to the case over the next several months. Ultimately, on June 8, 2009, the court granted a motion to conditional certify an opt-in collective action of "all current and former hourly Elwood TRI employees who have been assigned to work as process associates with Honda within the three years prior to the filing of this case."

On March 29, 2012, the court granted the defendants' motion to decertify the collective action on before of all temp. workers employed at the Honda plant, requiring each to file his or her own statement of intent to proceed with an individual claim and to pay the required filing fee. After several plaintiffs were dismissed for various reasons, this group of individually prosecuted FLSA actions was referred to loosely as the "Briggins class," composed of a total of 202 temporary workers employed by Elwood TRI and assigned to work as production process workers at the Honda plant.

On April 19, 2013, the "Briggins" group of cases was referred to the undersigned magistrate judge for mediation. Based on that reference, all scheduling deadlines in the "Burroughs" group of cases were also stayed until July 15, 2013. Although the order did not expressly refer the cases to the undersigned for mediation, all parties understood the purpose of the stay to allow for mediation.

Counsel for all parties met with the undersigned on June 13, 2013. After a day-long mediation session, agreement was reached on a framework for settling all of the individual cases in both the "Briggins" and "Burroughs" groups of cases. After the parties separately negotiated the specific terms of the of a settlement agreement, the cases were referred to the undersigned by the respective district judges for purposes of conducting a *Lynn's Food Stores* fairness hearing. In anticipation of the fairness hearing, the court entered an order applicable to all individual cases setting the fairness hearing for December 10, 2013, and requiring plaintiffs' counsel to mail to each individual plaintiff a letter notifying each plaintiff personally of the setting and the plaintiff's right to attend and object to the proposed settlement. Each letter also explained to the respective plaintiffs the amount of FLSA backpay he or she would receive under the settlement, how that amount was calculated, the fees and expenses expected to be paid to plaintiffs' counsel and how those amounts were derived.

On December 10, 2013, the court conducted a fairness hearing at which counsel for all parties were present. No individual plaintiff appeared or objected, and plaintiffs' counsel explained that, following the mailing of the required notice letter, they had received about fifty telephone calls with questions about the proposed settlement, but that no plaintiff had expressed opposition to it. The day following the fairness hearing, one plaintiff appeared at the office of the undersigned, stating that he was unable to come to the hearing the day before. He was instructed to write a letter to the court to explain any objections he had to the settlement, but no letter has been received since.

## II. *The Nature of Overtime Issues*

Plaintiffs contend generally that, prior to a date in 2009 when these practices ceased, they were required to perform certain job activities before the start of the timed work shift. Although the time-clock for pay was based on "scheduled time," that is, set to begin and end for every employee simultaneously, employees were required to be prepared for work immediately upon the commencement of the "scheduled time." To do so, however, employees were required to perform certain work-related tasks before the time-clock started. For example, plaintiffs allege

that they were required to gather and calibrate tools, perform production setup, gather materials and stock parts bins needed to carry out the work on the line, inspect work left over from the prior shift, and participate in short pre-shift meetings with management at which work assignments for the day were made. Similarly, they allege that upon returning from their 30–minute lunch break, they often had to gather tools or materials for use on the production line before it started up after the lunch break. (See Doc. 172, pp. 29–30, in Case No. 1:08–cv–1239–VEH). They allege that although this off-the-clock time varied from department-to-department and person-to-person within each department, the average time required for pre-shift work was about several minutes per shift per person. Because pay was based on 40 hours of "scheduled time", this pre-shift and lunch-break time was not captured and constituted unpaid overtime for each pay period.

Defendants deny that any unpaid overtime occurred, or at worst was only occasional and *de minimis*. It is agreed that time-keeping methods changed in 2009, which eliminated the possibility of unpaid, pre-shift or lunch-break work.

### III. *The Proposed Settlement Agreement*

Following several years of litigation and a full day of mediation, the parties reached an agreement on a framework for settling all 587 cases. Pursuant to the framework, the parties have drafted a proposed settlement agreement, which is attached hereto as a SEALED Attachment C. Under the agreement, the defendants have agreed to pay a sum of money to each individual plaintiff, representing disputed unpaid wages calculated on the basis of several factors, but no liquidated damages. The defendants also agree to pay counsel representing the plaintiffs the sum of $1,200,000.00, in full payment of fees, costs,

and expenses incurred by the plaintiffs in these actions, which sum is in addition to and above and beyond the amounts paid to the individual plaintiffs. In return for these payments, plaintiffs agree to dismiss all 587 of the pending FLSA cases (including these two original cases and the related cases listed in Attachments A and B) and dismiss the appeal in *Thsia Briggins v. Elwood TRI, Inc., et al.,* now pending under Eleventh Circuit Docket Number 12–14833.

The actual sums to be paid to each individual plaintiff are set out in two spreadsheets attached hereto as SEALED Attachments D (the "Burroughs" plaintiffs) and E (the "Briggins" plaintiffs). These sums are calculated on the basis of several factors, including the length of time the plaintiff was employed under the allegedly illegal compensation procedures, whether employed by Honda or as a temporary worker, the hourly pay rate the plaintiff received while employed, and whether the plaintiff incurred lost time due to active participation in the litigation, such as being a lead plaintiff, or one required to answer written discovery or attend a deposition. Each plaintiff will receive a minimum sum, regardless of how short a time employed, which sum increases the longer the plaintiff was employed. Also, the "Burroughs" plaintiffs received greater pay-outs because they were employed directly by defendant Honda and paid at higher hourly rates that the temporary workers comprising the "Briggins" group of plaintiffs.

The settlement agreement also defines a payment process by which pay-outs to plaintiffs will be carried out in return for execution of release agreements by each individual plaintiff. In the event an individual plaintiff fails to negotiate the check issued to him or her, the funds represented by the check will be returned to the defendants; provided, however, that such

a plaintiff may request issuance of a new check for up to one year following delivery of checks to plaintiffs' counsel for distribution. Should a plaintiff refuse to accept the calculated payment and refuse to sign the release, the defendants reserve the right to move to compel enforcement of the settlement agreement against such plaintiff, and to seek their fees and expenses in doing so from any plaintiff against whom they successfully enforce the agreement. Paragraph 9 of the proposed settlement agreement requires all parties to refrain from disclosing the terms of the settlement, except as may be necessary for tax or financial planning and as to immediate family members.

### IV. *Assessment of Fairness*

Because the minimum-wage and overtime-pay provisions of the FLSA are mandatory, there are only two ways in which a controverted claim can be settled, either through the supervision of the Secretary of Labor or after a court has scrutinized the proposed settlement for fairness to the plaintiff employees. *See Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1352–53 (11th Cir.1982). This is because:

> The FLSA was enacted for the purpose of protecting workers from substandard wages and oppressive working hours. *Barrentine v. Arkansas–Best Freight System,* 450 U.S. 728, 101 S.Ct. 1437, 1444, 67 L.Ed.2d 641 (1981). Recognizing that there are often great inequalities in bargaining power between employers and employees, Congress made the FLSA's provisions mandatory; thus, the provisions are not subject to negotiation or bargaining between employers and employees. *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 65 S.Ct.

895, 902, 89 L.Ed. 1296 (1945). "FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine v. Arkansas–Best Freight System,* supra at 1445 (citations omitted).

*Lynn's Food* at 1352. The role of the Secretary of Labor is to assure that employees are treated fairly and received all to which they are entitled under the Act. Similarly, in an action commenced by employees, a settlement scrutinized by the court assures that the disparity in bargaining power between employees and the employer does not result in a settlement that is unfair to the employees.

> Settlements may be permissible in the context of a suit brought by employees under the FLSA for back wages because initiation of the action by the employees provides some assurance of an adversarial context. The employees are likely to be represented by an attorney who can protect their rights under the statute. Thus, when the parties submit a settlement to the court for approval, the settlement is more likely to reflect a reasonable compromise of disputed issues than a mere waiver of statutory rights brought about by an employer's overreaching. If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute, we allow the district court to approve the settlement in order to promote the policy of encouraging settlement of litigation.

*Lynn's Food* at 1354.[1]

Although *Lynn's Food* requires a court to scrutinize a proposed settlement for

---

1. Although *Lynn's Food* uses the term "stipulated judgment" with reference to the settlement reached by the parties, subsequent cases

have held the it does not stand for the proposition that a settlement must take a particular form, but only that the proposed settlement

fairness, it does not describe the factors a court should use in doing so, and courts have struggled to apply *Lynn's Food* properly. For example, some courts have concluded that, because the FLSA requirement of full compensation is mandatory, an employer may not make settlement of an FLSA claim contingent on a confidentiality agreement, *see Dees v. Hydradry, Inc.*, 706 F.Supp.2d 1227 (M.D.Fla.2010), or upon a release of claims unrelated to the FLSA wage claim, *see Moreno v. Regions Bank*, 729 F.Supp.2d 1346 (M.D.Fla.2010). Other courts have concluded the opposite. *See Crabtree v. Volkert, Inc.*, 2013 WL 593500 (S.D.Ala. Feb. 14, 2013); *Hogan v. Allstate Beverage Co.*, 821 F.Supp.2d 1274 (M.D.Ala.2011). Factors that have been used by courts to assess the fairness of a proposed settlement include the following: (1) whether there is a *bona fide* dispute as to coverage of the FLSA or the amount of overtime to which the employee may be entitled, (2) whether the employee initiated the claim in a lawsuit, (3) whether the employee is represented by counsel, (4) whether the employer appears to be able to exercise undue leverage or influence over the employee, (5) how close to full compensation of the employee's claim is the proposed settlement, (6) whether the settlement includes or excludes liquidated damages and/or the employee's attorney's fees and expenses, and (7) whether the proposed settlement requires the employee to release other non-FLSA claims or places other restrictions on the employee in order to receive FLSA compensation. Fairness is an assessment of the balance of these factors, as no one of them is dispositive, although the absence of litigation initiated by the employee with the assistance of counsel strongly militates against fairness. Examining the proposed settlement must be examined by the district court for fairness to the employee. *See Rakip v. Para-*

requires an examination of all of these circumstances and perhaps others.

*a. Fairness of the Settlement Generally*

Looking at each of these factors and how they interact with each other, the court believes the settlement proposed in these cases is fair to all 587 employees involved and should be approved. First, it is very clear that a genuine *bona fide* dispute existed between the plaintiff employees and the defendants. The time, money, and effort spent litigating these claims demonstrate that dispute. But is it not simply the litigiousness of the parties; the underlying factual issues demonstrate a *bona fide* dispute. Defendants denied as a fact that any significant number of employees were required to gather tools or materials, or to calibrate tools, prior to the beginning of the timed shift. Any such instances, the defendants assert, were occasional and *de minimis*. Further, because employees rotated work stations and assignments, the likelihood that any significant number of employees continuously worked a job that required such pre-shift preparation is small. Thus, even is some employees may have performed pre-shift preparatory work, the amount would have been very small and extremely difficult to quantify. Adding to the difficulty of quantifying this pre-shift work is the fact that it became important for pay purposes only if it had the effect of pushing an employee into overtime status in any particular pay period. Honda points out that for much of the time period covered by these claims (2007 to 2009), the Great Recession (2008 to 2012) crippled the automobile business, resulting in very few weeks when employees actually had the opportunity to work overtime. Most employees actually worked fewer than the forty hours per week they were paid. Thus, there exists a

*dise Awnings Corp.*, 514 Fed.Appx. 917, 919 (11th Cir.2013).

true, *bona fide* dispute as to whether the plaintiff employees are entitled to any additional compensation for pre-shift work or that any particular plaintiff employee can actually quantify any unpaid overtime.

These 587 cases, of course, were initiated by the plaintiff employees with the assistance of counsel, and they all remain represented by counsel. Although the two original cases started as individual claims, each was conditionally certified as a collective action, during which time all of the remaining plaintiffs elected to opt into the litigation. When the cases were decertified, each of these plaintiffs chose to file his or her own individual claim and pay the required docket fee. These plaintiffs have actively litigated their claims and are well aware of the strengths and weaknesses in them. Counsel has represented them vigorously in the litigation since 2008, representing them at depositions and at the day-long mediation in June 2013.

Because this has been a seriously litigated matter, in which plaintiffs' counsel has actively represented and advised them, the ability of the defendant employers to exercise undue leverage over the plaintiffs is virtually non-existent. This is not a case in which the employer has attempted to resolve the FLSA issues by going directly to the plaintiff employees to attempt to influence them outside the protective context of the lawsuits and advice of counsel. There is no indication that the employers have exercised undue influence or exerted disproportionate bargaining power over the plaintiffs.

It is difficult to measure how close to full compensation of each plaintiff's claim the proposed settlement provides precisely because there are genuine factual disputes concerning whether any plaintiff has unpaid overtime and the number of uncompensated overtime hours each plaintiff can prove. Because the defendants maintained time records in the form a schedule

time clock, there are records indicating the amount of hours each plaintiff was scheduled to work. The claim for uncompensated overtime rests on each plaintiff's anecdotal evidence of having to perform certain pre-shift work activities on an irregular basis, activities that occurred *before* the scheduled work time recorded on the time clock. It is far from clear that any plaintiff can reasonably quantify any precise amount of overtime claimed for the reasons explained above, but the method of assigning value to each individual plaintiff's claim in the proposed settlement rationally arises from the pay scale each plaintiff worked under and the number of weeks he or she worked during the time frame covered by the FLSA claim. Each plaintiff is assured a minimum of $200 (minus taxes), regardless of how few weeks the plaintiff may have worked during the relevant time frame. That amount is then increased for each plaintiff depending upon the pay scale the plaintiff worked under ("Burrough" plaintiffs generally had a higher pay scale than the temporary workers in the "Briggins" group of plaintiffs) and the number of weeks employed during the relevant time frame. Thus, the longer a plaintiff was employed, the more overtime compensation is provided by the settlement. Also, the original named plaintiffs are given an enhancement, as are those plaintiffs who were required to respond to written discovery or appear for a deposition, on the ground that their active participation in the case, assisting counsel or answering interrogatories or testifying in a deposition, cut into the number of work hours the employee otherwise would have earned working. These calculations for each plaintiff are reflected in the spreadsheets that are SEALED attachments D and E.

These calculations represent a reasonable compromise of genuinely disputed claims. Whether any particular plaintiff

actually is unpaid compensation and, if so, how much, is strenuously disputed by the parties. To compromise the dispute, the parties have devised a system of calculations that rationally attempt to estimate each plaintiff employees' FLSA claim in terms of pay scale and number of weeks employed. While this calculation may not represent "full" compensation for some plaintiffs' FLSA claim, it may well represent full compensation or even exceed full compensation for a few of them. To the extent it does not represent "full" compensation, it is the product of a genuine and reasonable compromise.

Likewise, the fact that the settlement expressly does not include any liquidated damages is the product of a compromise of a genuine dispute. Because it is vehemently disputed whether any plaintiffs actually have uncompensated overtime greater than a mere *de minimis* amount, the parties reasonably agreed to concentrate on paying their disputed claims of unpaid overtime without the enhancement of liquidated damages. The defendants strenuously contend that the plaintiffs are not truly entitled to any additional compensation, so that it would be unjust to award liquidated damages with respect to disputed and allegedly undeserved claims.

The proposed settlement agreement provides for the payment of the plaintiff employees' attorneys' fees and litigation expenses separately from the payments they receive. "In *Silva v. Miller*, 307 Fed. Appx. 349 (11th Cir.2009), the Eleventh Circuit observed that the FLSA 'contemplates that "the wronged employee should receive his full wages plus the penalty without incurring any expense for legal fees or costs." ' " *Klatt v. All–Brand Food Distribution, Inc.*, 2010 WL 746492, *2 (M.D.Fla. Mar. 3, 2010). Thus, on the assessment of fairness, the proposed settlement provides the plaintiffs with all forms of relief authorized by the statute

(except liquidated damages) and it does not penalize the recovery of the plaintiffs by shifting the fee to them from the defendants.

### b. Confidentiality and Enforcement

There remain two problematic aspects of the settlement agreement, first that it remain confidential, and second, that defendants may seek attorneys' fees and expenses from any plaintiff who fails to comply with the provisions of the agreement. Paragraph 9 of the proposed agreement states the following:

9. The parties agree not to disclose the amount of this Agreement or the terms of the Agreement, except that parties may disclose this information to their attorneys, accountants, or other professional advisors, to whom they must make the disclosure in order for them to render professional services, and plaintiffs may disclose to their immediate family members, as long as they instruct them to maintain the confidentiality of this information just as they must, understanding that any breach of this paragraph will constitute a material breach of this Agreement resulting in irreparable harm and entitling the other parties to temporary, preliminary and permanent injunctive relief, and the costs, expenses and attorney's fees incurred in obtaining or attempting to obtain such relief.

As noted above, some courts have concluded that such restrictions on employees as a condition for payment of FLSA claims is a violation of the mandatory nature of the FLSA. *See, e.g., Dees v. Hydradry, Inc.*, 706 F.Supp.2d 1227, 1247 (M.D.Fla.2010). Additionally, paragraph 10 of the proposed agreement states:

10. The parties agree that if enforcement of this Agreement is required, including the individual payment to individual plaintiffs under paragraph 5,

defendants will file a motion to enforce the settlement and seek reasonable attorneys' fees, costs, and expenses against whom enforcement is obtained, consistent with the terms of the parties' settlement.

By this provision, defendants seek to compel all plaintiffs to accept the settlement on pain of having to pay defendants' fees and expenses for seeking to enforce it against a reluctant plaintiff. Because the magistrate judge believes these provisions unduly burden the plaintiff employees' rights under the FLSA, these provisions make the proposed settlement unfair.

"Settlement of an action under the FLSA differs from settlement of other claims." *Hogan v. Allstate Beverage Co., Inc.,* 821 F.Supp.2d 1274, 1281 (M.D.Ala. 2011). While litigants are free ordinarily to negotiate the terms of their settlement in any way they like, FLSA claims are different. Twice, the Supreme Court has emphasized that the FLSA was intended by Congress to ensure that workers receive the minimum and overtime wages mandated by the FLSA, and that those wages may not be negotiated away by contract or waiver. *See Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 708, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), and *D.A. Schulte, Inc. v. Gangi,* 328 U.S. 108, 114, 66 S.Ct. 925, 90 L.Ed. 1114 (1946). While the statutory right to compensation for unpaid overtime is a private right, it is "so charged or colored with the public interest" that waiver of the right "will not be allowed where it would thwart the legislative policy which it was designed to effectuate." *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 704, 65 S.Ct. 895, 901, 89 L.Ed. 1296 (1945). As the Court explained:

The legislative history of the Fair Labor Standards Act shows an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce. The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce. To accomplish this purpose standards of minimum wages and maximum hours were provided. Neither petitioner nor respondent suggests that the right to the basic statutory minimum wage could be waived by any employee subject to the Act. No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act.

*Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 706–07, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945) (footnotes omitted). For these reasons, the back-pay and liquidated damages provisions of the FLSA are "mandatory and generally not subject to bargaining, waiver, or modification by contract or settlement." *Hogan v. Allstate Beverage Co., Inc.,* 821 F.Supp.2d 1274, 1281 (M.D.Ala.2011).[2]

Because these provisions of the FLSA are mandatory, their compromise cannot be made contingent upon extraneous conditions, such as confidentiality agreements and the waiver of non-FLSA claims. Judge Thompson of the Middle District

---

**2.** To be sure, the Eleventh Circuit concluded in *Lynn's Food Stores, Inc., supra,* that there can be "a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute," subject to scrutiny and approval of the compromise settlement by the district court.

has held that "side deals" must be scrutinized carefully in order to prevent them from undermining the fundamental purpose and protections of the FLSA. In rejecting a proposed settlement agreement, he wrote:

> The settlement did not simply calculate a middle-ground sum of damages to award Hogan; rather the contract required Hogan to agree to a confidentiality provision and to a pervasive waiver of all other claims against Allstate Beverage. Such terms may be standard to civil litigation, but in the context of the FLSA, they represent "side deals." *Dees v. Hydradry, Inc.*, 706 F.Supp.2d 1227, 1238 (M.D.Fla.2010) (Merryday, J.). The provisions "confer a partially offsetting benefit on the employer" that is ancillary to the bona-fide dispute over FLSA coverage and wages due. *Id.*
>
> This is not to say that employees may never agree to ancillary terms when settling FLSA claims; but the court should closely scrutinize the fairness of such "side deals" because they do not directly relate to any bonafide [sic] dispute over FLSA coverage or wages due. Settlement of an FLSA claim is not an occasion for employers to extract valuable concessions unfairly from employees.

*Hogan v. Allstate Beverage Co., Inc.*, 821 F.Supp.2d 1274, 1282 (M.D.Ala.2011). Put simply, in order to be compensated consistent with the FLSA, an employee cannot be compelled to surrender other rights, for doing so undermines the fundamental mandatory nature of the minimum wage and overtime protections of the Act by enabling an employer to extract a price for simply doing what the Act requires.

Judge Thompson explained that confidentiality requirements in FLSA settlements hinder not only the public interest behind the Act, but also the rights of the employee himself. Confidentiality agreements hinder the public policy of universal enforcement of the FLSA, by hiding from the public the nature of the dispute and its resolution. "Absent some compelling reason, the, sealing from public scrutiny of FLSA agreements between employees and employers would thwart the public's independent interest in assuring that employees' wages are fair and thus do not endanger 'the national health and well-being.'" *Hogan v. Allstate Beverage Co., Inc.*, 821 F.Supp.2d 1274, 1283 (M.D.Ala.2011) quoting *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 708, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). Moreover, such confidentiality provisions impact the FLSA rights of the employee "for they prevent the employee from alerting other workers to potential FLSA violations on pain of personal liability" and by enabling the employer to "'retaliate against an employee for exercising FLSA rights' by advising other employees of FLSA violations." *Hogan v. Allstate Beverage Co., Inc.*, 821 F.Supp.2d 1274, 1284 (M.D.Ala.2011), citing and quoting *Dees v. Hydradry, Inc.*, 706 F.Supp.2d 1227, 1242 (M.D.Fla.2010); *see also DeGraff v. SMA Behavioral Health Services, Inc.*, 945 F.Supp.2d 1324, 1330 (M.D.Fla. 2013) (FLSA settlement rejected in part due to confidentiality agreement); *Poulin v. General Dynamics Shared Res., Inc.*, 2010 WL 1813497 (W.D.Va. May 5, 2010); *Webb v. CVS Caremark Corp.*, 2011 WL 6743284, *3 (M.D.Ga. Dec. 23, 2011) ("[I]t is likely the confidentiality provisions are unenforceable."); *Glass v. Krishna Krupa, LLC*, 2010 WL 4064017, *1 (S.D.Ala. Oct. 15, 2010) ("This court finds that the parties settlement agreement is due to be rejected as unreasonable because it contains a confidentiality provision."); *Parker v. Encore Rehab., Inc.*, 2012 WL 6680311, *5 (S.D.Ala. Dec. 21, 2012) ("[T]he confidentiality clause will not be approved."); *Robertson v. Ther–Rx Corp.*, 2011 WL 1810193, *1 (M.D.Ala. May 12, 2011) ("[T]he settlement's confidentiality provision will be stricken."); *Scott v. Memory*

*Co., LLC,* 2010 WL 4683621, *2 (M.D.Ala. Nov. 10, 2010) ("A confidentiality provision in an FLSA settlement agreement both contravenes the legislative purpose of the FLSA and undermines the Department of Labor's regulatory effort to notify employees of their FLSA rights."); *Bright v. Mental Health Resource Ctr., Inc.,* 2012 WL 868804 (M.D.Fla. Mar. 14, 2012); *Nava v. Ornelas Mexican Restaurant, Inc.,* 2013 WL 2248052, *4 n. 4 (N.D.Ala. May 22, 2013) ("The Court was not willing to approve the original agreements ... because they contained ... confidentiality provisions.").

A recent opinion from Judge Steele in the Southern District of Alabama has noted that confidentiality agreements in FLSA settlements are not *per se* invalid, as there can be "compelling reasons" for such agreements in some cases. *Crabtree v. Volkert, Inc.,* 2013 WL 593500, *4 (S.D.Ala. Feb. 14, 2013). Although the opinion acknowledged that "a substantial body of authority has denounced the use of confidentiality clauses in FLSA settlements," it went on to explain that approval of such provisions depends upon balancing the interests of the litigants in secrecy against the public interest in judicial openness. Approving a confidentiality agreement in that case, Judge Steele noted that it was the *plaintiff employees* who pressed for the confidentiality agreement for their own benefit, not that of the employer, and he found that factor tipped the balance in favor of approval of the provision.

The court does not believe that the balance favors confidentiality in this case. There appears to be no reason why secrecy regarding the settlement is in the interest of the plaintiff employees, and it is the defendants who insist upon it. The unfairness of the confidentiality provision in this case is particularly reflected in the provision that allows the defendants to seek fees and expenses incurred "in obtaining or *attempting* to obtain" (presumably even if it is an unsuccessful attempt) any injunctive relief against an employee for violating the confidentiality agreement. Because the confidentiality provision falls unequally on the employees compared to the defendant, it is unfair and should be rejected.

Rejection of the confidentiality provision in paragraph 9 of the proposed agreement does not necessitate rejection of the entire settlement agreement, which the court believes is essentially fair to the plaintiff employees. Because the confidentiality provision is not essential to the fairness of the settlement, the court should approve the proposed settlement except for the confidentiality provision, which should be stricken.

The same is true of part of the enforcement provision at paragraph 10. Once again, by seeking fees and expenses associated with enforcement of the settlement agreement, the defendants have unequally weighted the plaintiff employees' FLSA rights. Aside from the question whether the defendants may seek to enforce the settlement agreement against a plaintiff who balks,[3] taxing the employee with the defendants' fees, costs, and expenses of such a motion undermines the voluntariness and fairness of the proposed settlement.[4] In effect, the defendants are pre-

---

**3.** The court has no occasion to consider whether and what extent a party to an FLSA settlement may seek judicial enforcement of it. In this particular case, it is the provision taxing fees and expenses associated with enforcement, not necessarily enforcement itself, that makes the agreement unfair.

**4.** Defendants have argued that taxing the fees and costs associated with enforcement of the settlement agreement is not unfair because the plaintiff employees have been represented by counsel authorized to enter into the settlement agreement and they should not now refuse to be bound by it. Plaintiffs' counsel have stressed, however, that it was impracti-

senting the plaintiff employees with a "take it or leave it" settlement—take this settlement and be quiet about it, or we will sue you for enforcement of the agreement and shift the financial burden of our fees and expenses to you. This is precisely the type of unequal bargaining power the Supreme Court warned against. Even if the defendants may be entitled to seek judicial enforcement of the settlement agreement, taxing the fees and costs to the employee unduly and unfairly burdens his rights under the FLSA. To remedy this unfairness, the court should reject the provision taxing the fees and costs of any enforcement motion that may be filed with respect to any plaintiff who is able to show that he or she did not receive notice of the proposed settlement or who otherwise had no opportunity to express an objection to it.

## V. *Reasonableness of Plaintiffs' Attorneys Fees*

A final consideration related to the fairness and adequacy of the proposed settlement agreement is whether the attorneys' fees and expense reimbursement to be paid by the defendants is fair to the plaintiffs. As already noted, this is not a case in which the attorneys' fees represent a contingency portion of the payments made to the plaintiffs. Rather, the total payments to the plaintiffs are separate and distinct from the settlement agreement to pay their fees and expenses. The payment of the fees and expenses does not reduce the compensation negotiated for and payable to the plaintiff employees themselves. Nevertheless, the court is required to review for fairness and approve the fee and expenses proposed to be paid by the defendants in the settlement.[5] *Silva v. Miller*, 307 Fed.Appx. 349 (11th Cir.2009); *James v. Wash Depot Holdings, Inc.*, 489 F.Supp.2d 1341, 1346 (S.D.Fla.2007).

It is proposed that plaintiffs' counsel be paid a total of $1.2 million dollars, comprised of total attorneys' fees of $952,079.06 among all lawyers representing the plaintiffs and $247,920.94 in attorney-advanced litigation expenses. Although several law firms have been involved at one time or another in representing some or all of these plaintiffs, the principal lawyers representing them throughout these proceedings have been Robert Camp of The Cochran Firm and Robert Wiggins and other lawyers in the firm Wiggins, Childs, Quinn & Pantazis. Both sets of lawyers have submitted under seal their time records, expense sheets, and calculations for the

cal for them to meet with all 587 individual plaintiffs either before the mediation or certainly during the mediation in order to obtain their express authorization to settle under the terms then being negotiated. Rather, after the principal framework of the settlement was reached at the meditation, all plaintiffs were mailed notification of the proposed settlement and their individual shares in the recovery, and given an opportunity to object to the proposed settlement at the fairness hearing conducted on December 10, 2013. None appeared at that time, although one plaintiff appeared at the undersigned's office the next day, saying he was unable to attend the fairness hearing. He was instructed to mail a letter to the undersigned stating any objections he had to the settlement. To date, no letter has been received. Nonetheless, it is entirely possible that some plaintiffs did not receive the notice mailed to them and have had no chance to express any concern with or objection to the settlement of their individual claims. Such plaintiffs may well express opposition later, and it would be unfair to tax enforcement of the settlement against them under such circumstances.

5. This demonstrates the impracticality of sealing the proposed settlement agreement to maintain its confidentiality. Although the court is required to review and consider the proposed attorneys' fees and expenses, they cannot be discussed effectively in this report and recommendation without referring to the amounts involved and how these amounts were calculated.

fees they claim. (Doc. 379 in *Burroughs*, 1:08–cv–1239–VEH; Doc. 254 in *Briggins*, 1:08–cv–1861–KOB).

To award a fee under the FLSA, the court must first determine the "lodestar," which it the product of the plaintiffs' attorneys' reasonable hours multiplied by a reasonable hourly rate.

In the Eleventh Circuit, *Norman v. Hous. Auth. of the City of Montgomery*, 836 F.2d 1292 (11th Cir.1988), and *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), provide the framework for awarding attorneys fees to prevailing plaintiffs. To begin its analysis, the Court must first determine the "lodestar," which is calculated by multiplying the number of hours reasonably expended in a litigation by a reasonable hourly rate. *See e.g. Hensley*, 461 U.S. at 433, 103 S.Ct. 1933; *Norman*, 836 F.2d at 1299. While the "lodestar" method effectively replaced the balancing test previously prescribed by *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19, the twelve (12) *Johnson* factors "might still be considered in terms of their influence on the lodestar amount." *Norman*, 836 F.2d at 1299.

\*     \*     \*

The determination of reasonableness lies in the sound discretion of the trial court, *Norman*, 836 F.2d at 1301. In determining whether the number of hours expended on the litigation was reasonable, the district court should exclude from its initial fee calculation "hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. Also, in making this calculation, the court should exclude "time spent on discrete and unsuccessful claims." *Norman*, 836 F.2d at 1302.... "If fee applicants do not exercise billing judgment, courts are obligated to do it for them, to cut the amount of hours for which payment is sought, pruning out those that are 'excessive, redundant, or otherwise unnecessary.'" [*ACLU of Ga. v. Barnes*, 168 F.3d 423 (11th Cir. 1999)].

When determining a reasonable hourly rate, the rate should be "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299. "Evidence of rates may be adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence." *Id.* On the issue of a reasonable rate, the Court is itself considered an expert and can make an informed judgment as to a proper award of fees even without the benefit of outside testimony. *Id.* at 1303; *see also Loranger [v. Stierheim*, 10 F.3d 776, 781 (11th Cir.1994)].

*James v. Wash Depot Holdings, Inc.*, 489 F.Supp.2d 1341, 1346–47 (S.D.Fla.2007). Once the lodestar is calculated, there may be other factors that suggest enhancing or reducing the lodestar fee. The result obtained for the plaintiff is an important factor.

The most important factor to consider is the result obtained. [*Hensley* at 436–7, 103 S.Ct. 1933]. If the success was limited or the plaintiff's victory was limited, the lodestar must be reduced to reflect the limited result. *Norman*, 836 F.2d at 1302; *See also Popham v. City of Kennesaw*, 820 F.2d 1570, 1579–80 (11th Cir. 1987). Fee awards, however, should not simply be proportionate to the results obtained by the Plaintiff. *Andrews v. United States*, 122 F.3d 1367, 1376 (11th Cir.1997) (citing *Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)). As this Court has noted before, " [g]iven the nature of claims under the FLSA, it is not uncommon that attorneys' fee requests will exceed the

amount of judgment in the case.'" *Tyler v. Westway Auto. Serv. Ctr., Inc.,* 133 Fed.Appx. 604, 2005 WL 1208573, *9 (S.D.Fla.2005) (quoting *Holyfield v. F.P. Quinn & Co.,* 1991 WL 65928, *1 (N.D.Ill. April 21, 1991) (court awarded approximately $7,000 in fees even though the judgment was only $921)); *see also Davis v. Locke,* 936 F.2d 1208, 1215 (11th Cir.1991) (quoting *Rivera,* 477 U.S. at 574, 106 S.Ct. 2686) ("'Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms.'").

*James v. Wash Depot Holdings, Inc.,* 489 F.Supp.2d 1341, 1347 (S.D.Fla.2007).

Examining first the fee claim of Robert Camp and The Cochran Firm, these attorneys claim 2,572 hours for Camp, 39 hours for two other attorneys, and 511 hours for firm paralegals. Because this matter has involved representing at least 587 individual plaintiff employees[6], many of who have responded to written discovery requests and attended depositions requested by the defendants, and because this case has been hotly and actively litigated since 2008, these hours seem reasonable. Although it is true that much of the work performed benefitted many if not all of the plaintiffs at the same time, the time records show that there were many instances where the work involved single plaintiffs or small groups of them, such as representing them at depositions and securing their consents to opt in to the collective action. Taking Camp's claimed hours as an average of all 587 plaintiffs, he spent only 4.38 hours in each plaintiff's case. Likewise, averaging the 39 hours of the other two lawyers involved and the 511 hours for paralegals, it is clear that less than one hour more was involved in representing the average plaintiff beyond that claimed by Camp. A claim of slightly more than five hours of time per plaintiff does not seem excessive or unreasonable, even recognizing that much of that time was spent performing work for the collective group of all the plaintiffs, not just in individual cases. The court finds that the total hours claimed by Camp and The Cochran Firm is reasonable.

Against these reasonable hours, Camp claims an hourly rate of $400, while the remaining two lawyers claim hourly rates of $300. For the paralegals there is a blended rate of $98 per hour claimed. These rates also seem reasonable. Camp has more than 23 years of experience representing plaintiffs in FLSA and employment-related litigation, and he has a fine reputation for doing so in the legal community. He has been awarded fees of greater than this amount in litigation in other courts. As long ago as 2008, Camp was approved for an hourly rate of $350 by the Middle District of Alabama, so it is reasonable that the rate has increased to $400 per hour in the last five years.

Looking next at the fee award sought by Robert Wiggins and other lawyers at Wiggins, Childs, Quinn & Pantazis, the following represents the claimed hours relative to each collection of cases:

| *Attorney* | *Briggins Group* | *Burroughs Group* | *Total* |
|---|---|---|---|
| Robert Wiggins | 389.10 | 274.10 | 663.20 |

**6.** At various stages of the proceedings, there were more than 587 plaintiffs. However, only the remaining 587 can be used for calculation of the fee award as none of the other former plaintiffs are participating in this set-

| | | | |
|---|---|---|---|
| Candis McGowan | 105.00 [7] | 115.00 | 220.00 |
| Ann Wiggins | 64.50 | 33.10 | 97.60 |
| Kimberly Sanders | 20.50 | 0.00 | 20.50 |
| Russell Adams | 0.00 | 25.50 | 25.50 |
| Jake A. Kiser | 87.00 | 272.80 | 359.80 |
| Will Smith | 0.00 | 33.00 | 33.00 |
| Patrick Evans | 490.73 | 8.00 [8] | 498.73 |
| Dennis Pantazis, Jr. | 29.00 | 86.00 | 115.00 |
| Lacey Danley | 111.00 [9] | 0.00 | 111.00 |
| Sean Goldfarb | 37.30 | 0.00 | 37.30 |
| *Totals* | 1,334.13 | 847.50 | 2,181.63 |

In addition to these attorneys' hours, the paralegals at Wiggins, Childs, Quinn & Pantazis expended a total of 326.30 hours assisting the lawyers in both groups of cases.

The same reasons for concluding that Camp's and The Cochran Firm's expended hours were reasonable apply here as well. This is litigation that went on for over five years, before two separate judges. The docket sheets in both cases indicate that the cases were vigorously contested during the entire period, with litigation activity taking place almost constantly for five years. Counsel assisted many plaintiffs respond to written discovery and respond to deposition requests. Looking at these hours as an average in each case, the firm of Wiggins, Childs, Quinn & Pantazis put only 3.72 hours in each, plus a mere half-hour (.55 hours) in paralegal time in each. Again, while the court recognizes that much of the work performed was for the benefit of large numbers of the plaintiffs simultaneously, this still indicates that the time expended representing the interest of each and every plaintiff was not padded and was reasonable. The court finds that the time claimed by Wiggins, Childs, Quinn & Pantazis is reasonable.

The hourly rates claimed for each lawyer participating in these cases is as follows:

| Attorney | Hourly Rate | Years of Experience |
|---|---|---|
| Robert Wiggins | $625.00 | 38+ |
| Candis McGowan | $525.00 | 25+ |
| Ann Wiggins | $525.00 | 25+ |
| Kimberly Sanders | $275.00 | 7+ |
| Russell Adams | $450.00 | 20+ |
| Jake A. Kiser | $275.00 | 6+ |
| Will Smith | $200.00 | 4+ |
| Patrick Evans | $200.00 | 1+ |
| Dennis Pantazis, Jr. | $200.00 | 3+ |
| Lacey Danley | $200.00 | 1+ |
| Sean Goldfarb | $200.00 | 1+ |

These rates also appear to be reasonable.

tlement or can be viewed as having been successful.

7. At different places in the affidavit, the hours attributed to Candis McGowan in the Briggins group of cases is stated as 105.00 or 105.90. The court uses the lower figure.

8. At different places in the affidavit, the hours attributed to Patrick Evans in the Burroughs group of cases is stated as 8.60 or 8.00. The court uses the lower figure.

9. At different places in the affidavit, the hours attributed to Lacey Danley in the Briggins group of cases is stated as 111.50 or 111.00. The court uses the lower figure.

Robert Wiggins is regarded as one of the deans of the plaintiff's employment bar in this district, and his reputation for successfully representing plaintiffs in difficult and complex cases, as well as class actions, is well known to the court. Candis McGowan, Ann Wiggins, and Russell Adams, although not quite as experienced as Wiggins, are themselves highly regarded and skilled attorneys in labor and employment-related litigation. Rates of $275.00 or less for less experienced lawyers are in line with the rates charged by other firms and attorneys in north and central Alabama, as well as across the Southeast. Other courts have awarded fees to Wiggins and the other lawyers at Wiggins, Childs, Quinn & Pantazis consistent with these hourly rates. Wiggins has been awarded a fee based on $625 hour in MDL litigation in this district, and as long ago as 2007, he was awarded a fee based on $550.00 an hour. That his hourly rate has increased by $75.00 over the course of seven years is not unreasonable. The rates charged by McGowan, Ann Wiggins, and Adams also are consistent with the usual and customary rates charged in the Birmingham and central Alabama legal market for lawyers with experience and skill comparable to theirs. The rates of $275.00 per hour or less for the remaining attorneys are reasonable on their face.

An across the board rate of $125.00 per hour for paralegal time, regardless of the experience or skill of each paralegal, seems excessive, especially compared to the blended rate of $98.00 per hour claimed by Camp and The Cochran Firm. Accordingly, the court will reduce the hourly rate for paralegals to $100.00.

Applying these reasonable hourly rates to the reasonable hours expended, the lodestar fee calculated for the attorneys at Wiggins, Childs, Quinn & Pantazis is the following:

| Attorney | Hours | Rate | Lodestar Fee |
|---|---|---|---|
| Robert Wiggins | 663.20 | $625.00 | $414,500.00 |
| Candis McGowan | 220.00 | $525.00 | $115,500.00 [10] |
| Ann Wiggins | 97.60 | $525.00 | $51,240.00 |
| Kimberly Sanders | 20.50 | $275.00 | $5,637.50 |
| Russell Adams | 25.50 | $450.00 | $11,475.00 |
| Jake A. Kiser | 359.80 | $275.00 | $98,945.00 |
| Will Smith | 33.00 | $200.00 | $6,600.00 |
| Patrick Evans | 498.73 | $200.00 | $99,746.00 |
| Dennis Pantazis, Jr. | 115.00 | $200.00 | $23,000.00 |
| Lacey Danley | 111.00 | $200.00 | $22,200.00 |
| Sean Goldfarb | 37.30 | $200.00 | $7,460.00 |
| *Total WCQP Attorneys Lodestar Fee* | | | $856,303.50 |

Additionally, multiplying the reasonable hours of the paralegals by the reduced rate of $100.00 per hour, Wiggins, Childs, Quinn & Pantazis is entitled to an additional $32,630.00 for paralegal resources.

---

**10.** The court notes that in the calculation of the lodestar for Candis McGowan on page 15 of the Wiggins affidavit, a $6,000 error occurred. In the affidavit, relating to her hours in the Burroughs case, 115 hours is multiplied by the rate of $525 per hour, but the product is erroneously reported as $66,375.00, when, in fact, the correct product is $60,375.00. When the correct product is added to the lodestar from the Briggins cases (**105.00** hours × $525.00 = $55,125.00), the result is a lodestar of $115,500.00 ($60,375.00 + $55,125.00 = $115,500.00) for McGowan, not the combined amount of $121,972 reported at pages 14 and 15 of the Wiggins affidavit.

Thus, the total lodestar for all hours and work, both attorneys and paralegals, is $888,933.50. Dividing this lodestar by the 587 plaintiffs' individual cases, the average fee award to Wiggins, Childs, Quinn & Pantazis would be $1,515.37, which is reasonable.

Even though the lodestar fee calculated on the basis of the attorneys' reasonable hours and reasonable rates for all counsel in this case totals $1,979,511.50, the fee sought is only $952,079.60, a reduction of over fifty percent from the lodestar. As discussed above, Camp and The Cochran Firm's lodestar fee is calculated as $1,090,578.00, and the lodestar calculated for Wiggins, Childs, Quinn and Pantazis is $888,933.50. Added together, the total lodestar for all of plaintiffs' counsel is $1,979,511.50. Because counsel are seeking approval of a fee of only $952,079.60, the lodestar fee, which the court already has determined is reasonable, has been reduced by 52%, which clearly is reasonable on its face. As a per case average, the requested fee is $1,621.94 in each of the individual plaintiff's case, which also is reasonable on its face.[11]

Although the lodestar method of calculating awards of attorneys' fees has replace the twelve-factor analysis mandated by *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), those factors may be used for assessing whether to enhance or reduce the calculated lodestar. *See Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir.1988). Reviewing the fee sought here in light of the *Johnson* factors, the court is persuaded that no enhancement or reduction of the fee is required. The result obtained by plaintiffs' counsel is neither limited nor exceptional. On the one hand, the proposed settlement does not involve any sums for liquidated damages, it does succeed in securing a reasonable amount of compensation for unpaid overtime that is both dispute and very difficult to quantity. Also, the actions filed by plaintiffs' counsel resulted in the decision by the defendants in 2009 to discontinue the method of time-keeping that was the foundation of plaintiffs' FLSA claim. Thus, counsel succeeded in assuring that plaintiffs will not suffer the same alleged losses of overtime pay in the future. No enhancement or reduction of the requested fee is necessary due to this factor, given that the requested fee represents a 52% reduction from the lodestar in any event.

Other *Johnson* factors do not require any adjustment of the requested fee. The contingent nature of the fee and the delay in payment, if anything, argue for an enhancement, but plaintiffs' counsel have themselves limited the fee sought as part of the settlement of the cases. Likewise, FLSA cases and complex, multi-party cases tend to deter attorneys from representing plaintiffs because they involve novel legal issues and require special skill by counsel. Because these attorneys took the case and performed well, the fee they have requested should not be reduced. Also, the complexity of the cases necessarily impacted counsel's ability and availability

---

11. It is true that this average fee award is greater than the recovery many plaintiffs will receive, but this is not unusual in any FLSA case. The amount of unpaid overtime due to individual plaintiffs frequently is a relatively small amount. As several courts have noted, " '[g]iven the nature of claims under the FLSA, it is not uncommon that attorneys' fee requests will exceed the amount of judgment in the case.' " *James v. Wash Depot Holdings, Inc.*, 489 F.Supp.2d 1341, 1347 (S.D.Fla. 2007), quoting *Tyler v. Westway Auto. Serv. Ctr., Inc.*, 133 Fed.Appx. 604, 2005 WL 1208573, *9 (S.D.Fla.2005) (quoting *Holyfield v. F.P. Quinn & Co.*, 1991 WL 65928, *1 (N.D.Ill. April 21, 1991) (court awarded approximately $7,000 in fees even though the judgment was only $921)); *see also Davis v. Locke*, 936 F.2d 1208, 1215 (11th Cir.1991).

to take other cases, precluding other employment over the last five years. As already discussed above, these lawyers have superior reputations and experience in representing plaintiffs in FLSA and employment cases. The court finds, therefore, that, with the reduction of the lodestar already factored into the requested fee, the *Johnson v. Georgia Highway Express* factors do not require an adjustment of the fee.

### VI. *Reasonableness of Expense Reimbursement*

The proposed settlement also calls for defendants to pay plaintiffs $247,920.40 for reimbursement of plaintiffs' reasonable litigation expenses. These expenses represent costs incurred for filing fees, witness fee, court reporter fees, and other miscellaneous expenses for litigating these 587 individual cases. The largest share of the expenses was the filing fees required for each plaintiff's individual action after the two collective actions were decertified. Divided between the two main law firms representing the plaintiffs, these filing fees were at least $157,280.00 of the total expenses claimed. In the Briggins case, counsel advanced filing fees of $355.00 for each of scores of plaintiffs, or a total of $55,780.00.[12] Similarly, in the Burroughs case, counsel advanced filing fees for multiple plaintiffs, for a total of $101,500.00. Plainly court filing and docket fees are a reasonable expense for reimbursement. Divided among the cases, the average expense incurred for each case is $422.35,

which is only slightly more than the $355.00 filing fee required in each case when the collective actions were decertified. The expenses advanced by counsel appear to be reasonable and necessary, and should be approved.

### RECOMMENDATIONS

Based on the foregoing considerations, the magistrate judge RECOMMENDS the following:

1. That the parties' joint motion for approval of a settlement agreement be GRANTED and that the proposed settlement agreement attached hereto as SEALED attachment "C" be approved by the court, except as set out below, in the Burroughs case and all Burroughs-related cases (attachment "A") and in the Briggins case and all Briggins-related individual cases (attachment "B"), and that the court authorize the parties to proceed with processing the pay outs for each individual plaintiff as reflected in the spreadsheets annexed hereto SEALED attachments "D" and "E."

2. That the court disapprove, reject, and strike paragraph 9 of the proposed settlement agreement insofar as it purports to prevent and penalize disclosure of the settlement terms and provisions.

3. That the court disapprove, reject, and strike that part of paragraph 10 that authorizes the defendants to seek[13] their fees and expenses incurred in pursuing a motion to enforce the settlement agreement against any plaintiff who is able to

---

12. It appears that counsel are seeking reimbursement for less than the total that would be incurred to pay a $355.00 filing fee for each of the 587 plaintiffs, which total would be $208,385.00. The claimed total fee of $157,280.00, if divided by a filing fee of $355.00, would represent fees on behalf of 443 plaintiffs. In any event, the records submitted by plaintiffs' counsel reflect only a total filing fee advancement of $157,280.00.

13. To be clear, the parties view the effect of this language differently. While defendants assert that this provision of paragraph 10 grants them their fees and expenses related to any enforcement motion, the plaintiffs contend that it only authorizes the defendants to "seek" the fees and expenses, which remain within the discretion of the court to grant or deny.

show that he or she did not receive notification of the proposed settlement or otherwise did not have a reasonable opportunity to object to it.

4. That the court approve a total attorneys' fee for plaintiffs' counsel in both groups of related cases in the amount of $952,079.60 and litigation expenses of $247,920.40, to be paid by defendants pursuant to paragraph 5 of the proposed settlement agreement.

The Clerk is DIRECTED to enter this report and recommendation in each of the cases and the related cases listed in attachments "A" and "B," but filing attachments "C," "D," and "E" UNDER SEAL.

### NOTICE OF RIGHT TO OBJECT

Any party who objects to this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court. **Any objections to the failure of the magistrate judge to address any contention raised in the petition also must be included.** Failure to do so will bar any later challenge or review of the factual findings **or legal conclusions** of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir.1982) (*en banc*). In order to challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge. The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record. The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a district judge.

DONE this 6th day of February, 2013.